UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Students 4 Mental Health Justice,<br><br>        Plaintiff,<br><br>v.<br><br>The President and Fellows of Harvard College a/k/a the Harvard Corporation d/b/a Harvard University<br><br>        Defendant. | CIVIL ACTION NO.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.    PRELIMINARY STATEMENT

1.    Harvard University ("Harvard"), the oldest university in the United States, systematically discriminates against its students with mental health disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), *et seq.*; the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*; and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Students 4 Mental Health Justice ("S4MHJ") brings this action to remedy Harvard's systemic discrimination against its members, who include students with mental health disabilities attending Harvard.

2.    Harvard is a highly selective university, ranking third among national universities

1

and first in global rankings,[1] with tuition and associated fees of over $85,000 per year.[2] Despite its elite status, Harvard's antiquated policies, practices, and procedures are rooted in stigma around mental health, and discriminate against students with mental health disabilities.

3.      In recent years, rates of reported mental health conditions have increased at higher education institutions across the country, including at Harvard.[3] Yet, Harvard responds to disability-related behavior with exclusion, blame, and draconian measures. Most significantly, Harvard systemically bans students from its campus who are experiencing mental health crises— or whom Harvard perceives to be experiencing such—thus depriving them of their community and supports during a particularly vulnerable time. Harvard then forces these students to undergo burdensome requirements to return, many of which are unrelated to their mental health recovery, in contrast with minimal requirements imposed on students who leave campus or take leaves of absence for non-mental health reasons. Harvard also requires students to sign coercive and onerous contracts that require students to give up their medical privacy and undergo mental health treatment under threat of expulsion. These contracts, which give Harvard the right to surveil students' private medical decisions and access private medical information in order to

---

[1] U.S. News, 2025 Best National University Rankings, available at https://www.usnews.com/best-colleges/rankings/national-universities?_sort=rank&_sortDirection=asc 2024-2025 Best Global Universities Rankings, U.S. News, available at https://www.usnews.com/education/best-global-universities/rankings.

[2] Harvard FAS Registrar's Office, Harvard College Tuition Rates (Academic Year 2025-26), available at https://registrar.fas.harvard.edu/tuition-and-fees#hcol.

[3] Harvard University, Report of the Task Force on Managing Student Mental Health at 3 (June 2020), https://provost.harvard.edu/files/provost/files/report_of_the_task_force_on_managing_student_mental_health.pdf ("Our investigation confirmed that Harvard students are experiencing rising levels of depression and anxiety disorders, and high and widespread levels of anxiety, depression, loneliness, and other conditions"). *See also* The Harvard Crimson, University Task Force Finds Increase in Harvard Undergraduates Reporting Depression, Anxiety (July 2020), https://www.thecrimson.com/article/2020/7/25/harvard-mental-health-task-force/.

return to enrollment and campus, are applied routinely to students with a wide range of mental health conditions and are not tailored or individualized to the students' care needs. Because of Harvard's policies, current students report a chilling effect on seeking needed mental health supports for fear of being banned from campus and subjected to onerous requirements in order to return.

4.      Harvard's policies, practices, and procedures illegally discriminate against students with mental health disabilities and must be ceased immediately.

## II.    <u>JURISDICTION AND VENUE</u>

5.      This is an action for declaratory and injunctive relief, brought pursuant to the ADA, 42 U.S.C. § 12182, *et seq.*; Section 504, 29 U.S.C. § 794, *et seq.*; the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*; and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiff's claims arising under the ADA, Section 504, and the Fair Housing Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for claims arising under the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391. A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

## III.   <u>PARTIES</u>

8.      Plaintiff Students 4 Mental Health Justice ("S4MHJ") is a student-led membership advocacy group dedicated to building college campuses that are inclusive for students who are neurodivergent, mentally ill, and/or experience mental health crises. Many of S4MHJ's members are current Harvard students with mental health disabilities who have been directly harmed by Harvard's discriminatory policies and practices.

9.       Defendant, the President and Fellows of Harvard College, also known as the Harvard Corporation, originally chartered in 1650, is a Massachusetts corporation that operates under the name Harvard University, and is Harvard's principal governing and policy-making body.

10.      Harvard University is a private university located in Cambridge, Massachusetts. As a place of education, Harvard qualifies as a "public accommodation" under Title III of the ADA as that term is defined under 42 U.S.C. § 12181(7)(J). Harvard is also a recipient of federal financial assistance within the meaning of Section 504. Harvard's residence halls are covered "dwellings" under the Fair Housing Act, 42 U.S.C. § 3602(b), (c). Harvard operates programs and activities in the Commonwealth of Massachusetts and is subject to the Massachusetts Constitution.

## IV.      FACTUAL ALLEGATIONS

### A.       Plaintiff Students 4 Mental Health Justice

11.      Plaintiff, Students 4 Mental Health Justice is a student-led group that advocates to build college campuses that are inclusive for students who are neurodivergent, mentally ill, and/or experience mental health crises.

12.      Students 4 Mental Health Justice's mission is "to ensure all are included in higher education, by generating community-driven research, working in policy-making systems, and fostering solidarity among students forced underground by discriminatory policies."[4]

13.      S4MHJ is a community of neurodivergent and mentally ill people, with a current membership of approximately 30, most of whom are current Harvard students with mental health

---

[4] Students 4 Mental Health Justice Organizational Roadmap at 2, available at https://docs.google.com/document/d/1r3H_Ko1VoWDYkbG6ePnXRgDPdVGKlWl8ekL4w5XCo4E/edit?tab=t.0.

disabilities who have been directly harmed by Harvard's discriminatory policies, practices, and procedures, and continue to be subject to them. Many S4MHJ members, including Students A, B, C, D, and E, have mental health conditions that substantially limit one or more major life activities, including sleeping, eating, learning, thinking, concentrating, and living, and/or major bodily functions, including brain, neurological, or cognitive functions.

14.     S4MHJ's projects include researching university leave of absence policies and advocating for state legislation protecting higher education students with mental health disabilities.

15.     S4MHJ brings this suit on behalf of its members in the Harvard community with mental health disabilities to change these discriminatory policies and to protect their members and others from the current and future discrimination.

16.     Harvard has excluded members of S4MHJ from the College's programs and services—including its campus and facilities—because of their disabilities. Numerous members of S4MHJ have also been deterred from fully participating in Harvard's programs and services, including its mental health counseling services, out of fear that Harvard will exclude them from student life because of their disability.

**B.     Student A**

17.     For example, one current S4MHJ member ("Student A"), a Harvard student with a diagnosed mental health disability, was placed on a semester-long leave of absence as a result of a mental health-related hospitalization in December 2022. Because Harvard did not permit Student A back on campus after her hospitalization, even to finish final exams, she risked being forced into an academic withdrawal. An academic withdrawal would have put her degree in jeopardy. Given the limited choice between being forced into academic withdrawal or taking a medical leave of absence for the rest of the term and entire next semester, Student A chose the

latter.

18.      However, despite agreeing to take a leave of absence, Harvard did not lift Student

A's campus ban—even to retrieve her clothing and personal items from her student housing.

Because Harvard banned her from campus, Student A had to borrow hospital clothing, and her

parents had to travel to Harvard from Georgia to remove her belongings from her on-campus

housing. Student A was not allowed to assist her parents or even enter areas of Harvard where

members of the general public are allowed.

19.      After Student A's leave formally began, she received a letter from Harvard

informing her that she would have to petition Harvard's Administrative Board to return,

including demonstrating compliance with Harvard's reinstatement requirements as memorialized

in a document called the "HUHS Rider." These reinstatement requirements included six months

of continuous, full-time work that had to be verified by a letter from her supervisor;[5] six months

of active participation in mental health treatment and detailed letters from her healthcare

providers about that treatment and her progress; the names and contact information of her

healthcare providers; HIPAA releases for Harvard to speak with her healthcare providers; and a

personal statement.

20.      The letter also explained that Student A's Harvard student health insurance would

terminate while she was on leave. Because Harvard terminated her health insurance but still

required her to immediately engage in mental health treatment in order to return to school,

Student A and her family had to take on burdensome out-of-pocket costs for mental health care.

21.      Student A ultimately fulfilled each of Harvard's requirements to return and was

---

[5] Student A's resident dean also contacted her supervisor regarding the letter before submitting it
to the Administrative Board for review.

permitted to return in the Fall of 2023. When Student A returned, Harvard staff at the Counseling

and Mental Health Service ("CAMHS") also requested the names of Student A's mental health

treatment providers. In order to preserve her medical privacy, Student A is receiving off-campus

mental health treatment. She would prefer to use on-campus mental health treatment providers

but does not because those on-campus providers report to Harvard Administrators.

     **C.**    <u>**Student B**</u>

     22.     Student B is another S4MHJ member at Harvard with a mental health disability.

Harvard banned Student B from entering the Harvard University campus after she was taken to

the Emergency Room at McLean Hospital for mental health reasons towards the end of her

freshman Fall semester in 2022. While she was in the hospital, Student B's Resident Dean told

her that she was not cleared to return to her residence or for enrollment.[6] Student B repeatedly

asked her Resident Dean to tell her what steps she needed to take in order to return to campus,

but her Resident Dean deflected and would not provide her with any details on how to return,

instead they told Student B to focus on her recovery instead, or words to that effect.

     23.     Because Harvard had banned Student B from returning to her housing or

continuing her enrollment, she could not complete her coursework. Harvard also prohibited

Student B from accessing her dorm room—her only housing in Massachusetts—and did not

allow Student B (whether escorted or not) to gather any personal belongings, clothing, or even

her toothbrush from her room. Consequently, Student B's father had to fly from Virginia to

Massachusetts to pack up her dorm room with Student B's Resident Dean.

     24.     Because the only instruction Harvard provided to her was that she needed to focus

---

[6] Student B's hospital discharge summary identified her as being "placed on involuntary medical leave after recent incident."

on her recovery before she could return to Harvard, Student B engaged in a residential treatment program, where she remained for over a month. Eager to return to Harvard for the Spring 2023 semester so as not to disrupt her academic career any further, Student B asked multiple times for an explanation of what she needed to do to re-enroll and return to campus. The Spring 2023 semester began on January 24, 2023; however, Harvard did not give Student B any instructions about how to return to Harvard until January 6, 2023.

26.    Harvard instructed Student B that she would have to petition to return. Student B's Resident Dean told Student B that, as part of the petition process, she would need to write a personal statement explaining why she "might be ready to return" and what her "support structure" on campus would be. The Resident Dean also told her that she must also be interviewed by CAMHS. Harvard required Student B to provide CAMHS and Harvard with a HIPAA release of medical information in order for CAMHS to speak to her treatment providers. She was told that CAMHS would then submit a letter to Harvard's Administrative Board[7] summarizing its conversations with Student B and Student B's treatment providers.

26.    Student B was allowed to return to Harvard on January 25, 2023—a day after the semester began. However, as a condition of returning, Harvard required Student B to sign a treatment contract, which required Student B to sign another HIPAA release of all medical information to Harvard officials, allow Harvard to contact her treating providers on an ongoing basis, continue taking prescribed medications, attend all appointments with her treatment team, comply with all recommendations of her treatment team, submit to on-demand psychological evaluation by Harvard, and abstain from the use of drugs and alcohol for the duration of her attendance at Harvard, regardless of her age, among other requirements. The contract also stated

---

[7] The Administrative Board decides all student petitions to return to Harvard.

that failure to comply with any of its terms could result in permanent dismissal from Harvard.

27.     Student B was told that she would have to re-sign the same treatment contract every academic year until graduation and that it is not possible to negotiate any terms of the contract. Since that initial contract, Harvard has required her to sign treatment contracts with the same conditions on August 29, 2023, and August 19, 2024.

28.     Student B fears that she might be permanently barred from Harvard and immediately evicted from on-campus housing if she has another mental health crisis or is deemed to have violated her treatment contract in any way.

### D.     **Student C**

29.     A third S4MHJ member ("Student C"), a Harvard student with a diagnosed mental health disability, has been banned from campus twice and required to sign a treatment contract nearly every semester of her college career since her freshman Fall semester.

30.     Most recently, while hospitalized at McLean Hospital in December 2024, Harvard informed Student C that she was not allowed to return to her dorm or step foot on any property owned by Harvard—including public property—even for a day, or to retrieve her personal belongings.

31.     To return to enrollment and housing, Harvard required Student C to petition the Administrative Board. As part of the petition to return process, Student C had to write a personal statement, release treatment records from her inpatient and outpatient mental health providers, and undergo an evaluation by CAMHS.

32.     While the Administrative Board granted Student C's petition to return, Student C's readmission was conditioned on her compliance with the treatment contract she had signed before her hospitalization. Student C's Resident Dean told her that she must continue taking medication and working with her outpatient mental health treatment providers, and warned her

that she must "take her distress" only to the Dean and Student C's treatment team, not her peers.

33.    In the years following Student C's first hospitalization, Student C has also been subject to invasive surveillance from her Resident Dean and the two resident tutors in her dorm: Student C's Resident Deans have required regular check-ins with Student C, and called Student C's mental health provider to inquire whether Student C had spoken about her psychiatric medication with the provider. After Student C's second hospitalization, a graduate student proctor for her residence—similar to a resident advisor at other universities—twice entered Student C's dorm room without permission, and even flipped over Student C's blanket while Student C lay in bed when Student C did not come down to a group dinner.

34.    Student C is currently under a campus ban instituted by the Ad Board on May 6, 2025 after a hospitalization. Under the current ban, she is only permitted to go on campus to go to the library in order to finish her coursework and to take one final exam. The Ad Board's decision only allows her to participate in commencement activities under conditions not imposed on other graduating students, including the requirement that Student C's parents be present and share their contact information with Harvard. As such, Student C is deprived of access to nearly all Harvard's programs and services besides basic academic programs.

**E.    Student D**

35.    Another S4MHJ member ("Student D"), a Harvard student with a mental health disability, was deterred from seeking on-campus mental health treatment for suicidal ideation because she feared that she would be placed on a leave of absence. She ultimately sought treatment off campus due to these fears. Student D only started speaking candidly with her mental health treatment provider about suicidal ideation and self harm once she was sure that her treatment provider would not share any of her medical or treatment information with Harvard. Student D's treatment provider recommended that she seek psychiatric care on campus. Student

10

D chose not to do so due to her fears about triggering a campus ban or an involuntary leave of absence.

    **F.**    **Student E**

36.    S4HMJ member Student E, another Harvard student with a mental health disability, was forced to remain hospitalized not because he needed further treatment but because Harvard refused to allow him back to Harvard's campus after thoughts of self-harm caused him to go to the Emergency Room in the Fall 2023 semester.

37.    Although Student E's treatment providers at McLean Hospital determined that he could be discharged by or around Wednesday, October 4, 2023, and preferred to discharge him at that time, a Harvard representative told McLean Hospital personnel that Harvard preferred that Student E be discharged on Tuesday, October 10, 2023, even though McLean Hospital personnel believed an extended stay "would not be therapeutic."

38.    After extensive advocacy by Student E and his McLean provider during calls with representatives from Harvard on October 4, 2023, Harvard finally informed Student E that he was cleared to continue enrollment and return to on-campus housing on October 5, 2023, under the condition that he sign a treatment contract with Harvard and that Student E and his McLean provider both meet with CAMHS.

39.    On October 5, 2023, Student E signed a treatment contract that required him to release medical information to Harvard officials, continue taking prescribed medications, attend all appointments with his treatment team, comply with all recommendations of his treatment team, submit to on-demand psychological evaluations by Harvard, and abstain from the use of drugs and alcohol for the duration of his attendance at Harvard, regardless of his age, among other requirements. The contract threatened that failure to comply with its terms, including the release of medical information to Harvard officials, could result in permanent dismissal from

Harvard.

40.     Harvard has informed Student E that he must re-sign the same treatment contract every academic year until graduation in order to remain enrolled and housed, and that it is not possible to negotiate the substantive terms of the contract. Accordingly, Harvard required Student E to sign another treatment contract with the same conditions in February 2024. Student E understands that Harvard has not consulted with his long-term off-campus therapist in determining the substance of the treatment contract.

41.     Student E is now subject to surveillance by Harvard personnel. For example, Student E's Resident Dean contacted Student E about a missed psychiatric appointment in November 2024 and mandated that he reschedule the missed appointment immediately, even though he was attending his off-campus therapy appointments weekly and consistently taking his prescribed medications. Because Student E's psychiatrist has only had available appointments during Student E's class times during Spring term of 2025, Student E had to miss a class in order to make up the missed appointment.

42.     Student E fears that he might be permanently barred from Harvard if he has another mental health crisis or is deemed to have violated his treatment contract in any way. Student F also fears that he will not be able to fully trust his mental health care providers due to the threat of possible expulsion and eviction hanging over his head if he begins to need more intensive care or is deemed to be in any way out of compliance with his treatment contract.

## IV.    HARVARD'S DISCRIMINATORY POLICIES

43.     S4MHJ members Students A, B, C, D, and E were all subjected to Harvard's discriminatory policies and practices. These students and other S4MHJ members at Harvard, and all other Harvard students with mental health disabilities, are at risk of being harmed by Harvard's policies, practices, and procedures described below.

A.     **Harvard Denies Students with Mental Health Disabilities Equal Access by Excluding Them from Campus and Housing.**

44.     Harvard policy, as outlined in the Harvard Student Handbook, provides for the placement of students on involuntary leave of absence for several disability-related reasons, including students who are "not cleared to return to enrollment and/or residence at Harvard College following . . . a hospitalization or emergency room visit that raises serious concerns about the student's health or well-being."[8] Students may also be placed on an involuntary leave of absence for failure to adhere to the terms of an "agreement to engage in treatment" ("treatment contract").[9]

45.     Harvard policy maintains that "[a]fter a hospitalization or emergency room visit . . . . Harvard College ordinarily will not permit that student to return to residence and enrollment or participation in any Harvard-related programs or activities before making its own assessment of the suitability of the student's return."[10]

46.     However, in practice, if a student visits the emergency room for a mental health related reason, Harvard immediately bans the student from campus even if the ER treating physicians do not think the student requires inpatient treatment and prefer to discharge the student immediately. As described by the members of S4MHJ, Harvard has repeatedly informed students that they are not allowed on campus premises shortly after admission to a hospital or emergency room for a mental health crisis, even after they have recovered and do not pose a threat of disruption or otherwise to themselves or to anyone else.

47.     Under Harvard's policy, these students are unable to step foot on Harvard College

---

[8] Harvard College Student Handbook 2024–25, at 43.
[9] *Id.*

[10] *Id.* at 87.

or University property, which means they have no housing, cannot return to on-campus employment, cannot participate in student activities, cannot use campus libraries—even to finish makeup exams or assignments—and cannot attend classes without "prior, express permission"[11] while they wait for Harvard to decide whether they may return to campus. As a result, these students lose access to housing, support networks, and their personal belongings (including wallets, personal documents, clothing, and personal hygiene items) during an extremely vulnerable time. They become relegated to a status that is even more restricted than members of the general public—about whom Harvard knows nothing—who are generally free to enter Harvard's campus.

48.    Students who have been hospitalized or admitted to the emergency room for mental health reasons are expected to vacate university property "as soon as possible and no later than five business days after" the decision to exclude them from campus.[12] This means they are required to remove all of their property from their Harvard housing. This is a difficult and expensive task, because these students are not allowed on campus to collect and remove their belongings themselves. This policy thus typically results in students' families bearing the expense to quickly travel to campus in order to collect and remove their children's belongings for them.

49.    Harvard often does not provide students with any direction about what to do after vacating university property, which leaves students who may have just experienced a crisis in limbo—unsure of the duration of their exclusion, the requirements to return, or where to go, while their student career is in jeopardy. For example, Student B was not told where she could

---

[11] *Id.* at 45.
[12] *Id.* at 44.

stay or live, or for how long she would have to relocate, before being allowed to return to campus.

50.     Harvard policy requires that students who are excluded from campus on these bases sign "agreements to engage in treatment," or treatment contracts, as a condition to return to campus; students subject to treatment contracts may be excluded from campus again or even permanently dismissed from Harvard for failure to adhere to the terms of such contracts.

51.     For some students with mental health disabilities, including S4MHJ member Student A, exclusion from campus takes the form of a leave of absence. Harvard's policies require these students to stay away from campus for a minimum amount of time—usually four to six months—regardless of their individual circumstances. Harvard's policies maintain that first-year students ordinarily will not be allowed to return from leave before the following fall semester.[13]

52.     By immediately banning students with mental health disabilities from Harvard's campus, Harvard denies such students access to its educational and housing programs on the basis of stereotype in violation of federal and state discrimination laws.

**B.    <u>Harvard Imposes Discriminatory Criteria on Students Seeking to Return to Campus.</u>**

53.     Harvard imposes additional standards and criteria on students with mental health disabilities seeking to return to campus and housing after mental health leaves of absence or inpatient mental health treatment that it does not impose on students returning from leaves of absence for non-mental health reasons.

---

[13] *Id.* at 46.

1.    **Students Returning From Mental Health Leaves of Absence Face Additional Barriers and Must Satisfy Arbitrary Requirements to Return.**

54.    In order to return to campus following inpatient mental health treatment or a mental health related leave of absence, Harvard requires students with mental health disabilities to petition Harvard's Administrative Board to return. For students seeking to return from a mental health leave of absence, this requirement is set out in the Harvard University Health Services rider (hereinafter "HUHS Rider"). For students seeking to return from inpatient mental health treatment, this requirement is set out in the Petition to Return process.

55.    The HUHS Rider's checklist includes work and treatment requirements; meetings with Harvard administrators; a personal statement describing how the student spent their time away; and letters from employers and healthcare providers, including a detailed letter from their healthcare provider that includes the provider's contact information, information concerning the student's initial presentation, present treatment regime, medication regimen, compliance with treatment, and readiness to return. Harvard also requires students to waive privacy with their healthcare provider and sign HIPAA authorizations for HUHS to obtain information directly from their treatment providers and then share that information with the dean or academic office evaluating the petition for return. A student's petition to return may be denied for failing to meet any of these intrusive procedural requirements.

56.    Students seeking to return from a mental health leave of absence must also demonstrate a "substantial period of stability" and "engagement in productive activity" in order to return. To demonstrate "stability," Harvard requires students to document participation and

progress in medical treatment "for a period of ordinarily not less than six consecutive months."[14]

To demonstrate "engagement in productive activity," Harvard requires students to engage in six

or more months of employment at a non-academic job, and to provide a letter of

recommendation from their supervisor. For example, following a mental health leave of absence,

S4MHJ member Students A was required to work for six months in order to demonstrate

"readiness to return."

57.    Students seeking to return to Harvard from inpatient mental health treatment must

complete similar requirements through a "Petition to Return" to campus following inpatient

mental health treatment. For example, Student B was required to petition to return following

hospitalization and residential treatment for her eating disorder, in addition to signing a treatment

contract. The Petition to Return required Student B to write a personal statement, submit to an

interview with CAMHS, and sign a release of medical information for CAMHS to speak with her

treatment providers.

58.    Students with mental health disabilities seeking to return from mental health-

related leaves of absence or inpatient mental health treatment must also request an in-person

consultation with HUHS.

59.    In contrast, students who take an academic leave of absence are not required to

work while on leave or prove fitness to return,[15] and students in good standing who seek to return

from a non-mental health leave of absence may ordinarily return in any term simply by notifying

---

[14] Harvard HUHS Rider, at 1 ("one of the most important indicators of readiness to return to the demands of college life is a substantial period of stability and engagement in productive activity").

[15] *See* Layla Chaaraoui & Julia Torrey, *Code Blue: One student's struggles with Harvard's mental health services and medical policies*, Harvard Independent (Oct. 12, 2023), available at https://harvardindependent.com/code-blue/.

their Resident Dean.

60.      An October 2023 article in a Harvard student newspaper profiled a student,
Annie,[16] whose experience exemplifies this double bind. When Annie felt she needed a leave of
absence in order to prioritize her mental health, Harvard's policies presented her with an
ultimatum: she could either take a mental health leave, subject to Harvard's return requirements,
or she could stay while struggling with her mental health. Annie chose to put her mental health at
risk by staying, rather than facing the six-month work requirement and the arduous process of
petitioning to return.[17]

### 2.      Students Returning From Mental Health Inpatient Treatment or Hospitalization Must Sign Treatment Contracts.

61.      In order to return to campus following inpatient hospitalization or treatment,
Harvard requires students with mental health disabilities to sign agreements to engage in
treatment. These are known as "treatment contracts" or "care contracts." Such treatment
contracts require students to release private medical information to Harvard officials—including
allowing those officials to discuss private treatment information with student's providers,
continue taking prescribed medications, attend all appointments with the student's treatment
team, comply with all recommendations of the student's treatment team, submit to on-demand
psychological evaluation by Harvard, and abstain from the use of drugs and alcohol for the
duration of the student's attendance at Harvard, regardless of age, among other requirements.
The standard treatment contract states that Harvard may contact the student's family if the
student fails to meet the requirements of the contract, and that failure to comply with its terms,
including the release of medical information to Harvard officials, could result in permanent

---

[16] The student profiled in the article is referenced with a pseudonym to protect her privacy. *See Id*.
[17] *Id.*.

dismissal from Harvard.

62.    Although Harvard asserts that these treatment contracts are individualized, many students, including Students B, C, and E, have been compelled to sign materially identical treatment contracts throughout the duration of their enrollment at Harvard, indicating that there is no individualized analysis based on students' particular or changed circumstances and that Harvard instead imposes blanket requirements based on stereotypes and generalizations about people with mental health disabilities.

63.    Harvard's treatment contracts subject students with mental health disabilities to burdensome requirements not imposed on students without such disabilities and contribute to a culture of stigma and fear wherein students subject to such contracts feel that they are constantly surveilled in a manner that no other students are. Most significantly, students subject to treatment contracts run the risk of expulsion for failing to engage in psychotherapeutic or psychiatric treatment, even when such treatment conflicts with academic obligations, whereas students not subject to treatment contracts are not required to engage in psychotherapeutic or psychiatric treatment and do not risk expulsion for failing to do so.

C.    **Harvard Interferes with Students' Access to Mental Health Services on the Basis of Disability.**

64.    As a result of Harvard's policies, practices, and procedures, students with mental health disabilities are caught in a double bind: either stay away from student mental health services and risk a mental health crisis, or utilize these services and risk being temporarily banned from campus and having their education seriously disrupted or be permanently kicked out.[18]

---

[18] *See* Swathi Kella, *The Imperfect Storm: College Students and Suicide*, Harvard Political Review (Aug. 10, 2021), available at https://harvardpolitics.com/the-imperfect-storm/ ("These

65.    An official Harvard Task Force reported in 2020 that "[l]eaves of absence seem to be a source of fear and anxiety for some students," and that "students cited the possibility of being put on an involuntary leave as a reason not to seek help" or to be "hesitant[] to disclose their mental health challenges to Harvard-employed counselors and others in the administration, fearing the possibility that they would be asked to leave."[19]

66.    Student E felt that he could have benefited from inpatient treatment early in his time at Harvard, but because he feared being placed on an involuntary leave of absence and getting banned from campus, Student E was deterred from seeking such care until after he experienced a mental health crisis. Now subject to a treatment contract, Student E fears that he would not only be forced off campus, but have his admission revoked, if he seeks voluntary inpatient treatment for mental health treatment in the future. Similarly, as detailed above, Student D was deterred from seeking on campus mental health treatment because she feared being put on a leave of absence or being banned from campus.

67.    Harvard thus denies students with mental health disabilities an equal opportunity to participate and benefit from its programs and activities and deters students with mental health disabilities from accessing Harvard's programs, services, activities, including medical and mental health services, in violation of federal and state discrimination laws.

---

policies have had a chilling effect on students seeking mental health care, deterring them from obtaining help for fear of being placed on mandatory leave. 'It was either like I didn't get help, or I did get help, and it would have just cost me a medical leave,' shared [a student].").

[19] Harvard University, Report of the Task Force on Managing Student Mental Health (July 2020), *supra* note 3, at 14; *see also* Sellers Hill & Nia Orakwue, *At Harvard College, New Mental Health Resources Face Familiar Challenges*, The Harvard Crimson (Oct. 6, 2023), available at https://www.thecrimson.com/article/2023/10/6/mental-health-feature-harvard/#:~:text=The%20Harvard%20Crimson-,At%20Harvard%20College%2C%20New%20Mental%20Health%20Resources%20Face%20Familiar%20Challenges,understanding%20of%20these%20resources%20persist.

## V.    HARVARD'S DISCRIMINATORY POLICIES AND PRACTICES AFFECT S4MHJ MEMBERS AND OTHER HARVARD STUDENTS WITH MENTAL HEALTH DISABILITIES.

68.    A 2020 report issued by Harvard noted that between "2014 and 2018, the percentage of Harvard undergraduates reporting that they have or think they may have depression increased from 22% to 31%, and the percentage reporting that they have or think they may have an anxiety disorder increased from 19% to 30%."[20] Harvard graduate students also reported high rates of mental health conditions, with "almost a quarter of respondents exhibit[ing] symptoms of moderate to severe depression at the time of the survey, with a similar rate for moderate to severe generalized anxiety."[21] Applying these percentages to current admission numbers, Plaintiff estimates that over 2,000 undergraduates and over 4,000 graduate students may have qualifying mental health disabilities. These statistics likely undercount the total number since they only account for two mental health conditions—depression and anxiety disorder. Moreover, it is likely that some students did not report experiencing depression or anxiety—or respond to the survey at all—due to the stigmatization of these and other mental health disabilities.

69.    According to the American College Health Association, in 2024, twenty-one percent of college students reported having serious psychological distress. Thirty-five percent of college students were diagnosed with anxiety, and twenty-five percent had been diagnosed with depression.[22] Recent studies of college students indicate record numbers of students dealing with

---

[20]Harvard University, Report of the Task Force on Managing Student Mental Health (July 2020), *supra* note 3, at 4.
[21] *Id.*
[22] American College Health Association, *National College Health Assessment: Undergraduate Student Reference Group Data Report* (Fall 2024), at 64-65, 115, available at https://www.acha.org/wp-content/uploads/NCHA-IIIb_FALL_2024_UNDERGRADUATE_REFERENCE_GROUP_DATA_REPORT.pdf

depression, anxiety, eating disorders, and other mental health disabilities. For example, in 2017, the National Council on Disability reported that thirty-five percent of students met the criteria for at least one mental health disorder.[23] More recently, in 2023, a Healthy Minds Survey found that forty-four percent of students across campuses reported symptoms of depression.[24] These were considered some of the highest rates in the survey's fifteen-year history.[25]

## FIRST CAUSE OF ACTION

### Violations of Title III of the Americans with Disabilities Act

### 42 U.S.C. § 12182, *et seq.*

70.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of this Complaint.

71.     Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

72.     At all times relevant to this action, impacted members of Plaintiff S4MHJ were Harvard students who have mental health disabilities, and thus are qualified individuals with disabilities within the meaning of the ADA, because each has, has a record of having, or has

---

[23] National Council on Disability, *Mental Health on College Campuses: Investments, Accommodations Needed to Address Student Needs* (Jul. 21, 2017), available at https://www.ncd.gov/assets/uploads/reports/2017/ncd_mental_health_college_campuses.pdf.

[24] Daniel Eisenberg et al., *The Healthy Minds Study 2021-2022 Data Report* (2023), available at https://healthymindsnetwork.org/wp-content/uploads/2023/08/HMS-National-Report-2021-22_full.pdf.

[25] Univ. of Michigan School of Public Health, *College Students' Anxiety, Depression Higher Than Ever, but So Are Efforts to Receive Care* (Mar. 9, 2023), available at https://sph.umich.edu/news/2023posts/college-students-anxiety-depression-higher-than-ever-but-so-are-efforts-to-receive-care.html.

been regarded as having "a physical or mental impairment that substantially limits one or more major life activities" such as sleeping, eating, learning, thinking, concentrating, and living, or a major bodily function, such as brain, neurological, or cognitive functions. 42 U.S.C. § 12102(1). Current members of Plaintiff S4MHJ who are Harvard students are otherwise qualified to participate in Harvard services, programs, and activities.

73.    At all times relevant to this action, Harvard, as an undergraduate or postgraduate school, or other place of education, has been and is a "place of public accommodation" within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(J).

74.    Title III prohibits public accommodations from denying opportunities, or affording unequal opportunities, to an individual with a disability or class of individuals with disabilities to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity on the basis of disability, and from otherwise discriminating against such individuals on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

75.    Title III further defines discrimination to include the failure of a public accommodation to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

76.    Harvard has violated Title III of the ADA by denying Harvard student members of Plaintiff S4MHJ the opportunity to fully and equally enjoy, participate in, and benefit from Harvard's goods, services, facilities, privileges, advantages, and accommodations, on the basis of disability.

77.    Harvard has violated Title III of the ADA by failing to make reasonable modifications to its policies and practices to ensure that Harvard student members of S4MHJ have equal access to the benefits of Harvard's goods, services, facilities, privileges, advantages, and accommodations.

78.    As a proximate result of Harvard's violations of the ADA, Plaintiff's Harvard student members have been injured as set forth herein.

79.    Harvard's conduct has violated and continues to violate the ADA, and unless restrained from doing so, Harvard will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which Harvard student members of Plaintiff S4MHJ have no other adequate remedy at law. Consequently, Plaintiff is entitled to injunctive relief pursuant to section 308 of the ADA, 42 U.S.C. § 12188(a), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

80.    WHEREFORE, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973

### 29 U.S.C. § 794, *et seq.*

81.    Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of this Complaint.

82.    Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

83.     As individuals with mental health disabilities, impacted members of Plaintiff S4MHJ are persons with disabilities within the meaning of Section 504, because each has, has a record of having, or has been regarded as having a "physical or mental impairment that substantially limits one or more major life activities" such as sleeping, eating, learning, thinking, concentrating, and living. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20) (citing 42 U.S.C. § 12102). Current members of Plaintiff S4MHJ who are Harvard students are otherwise qualified to participate in Harvard services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

84.     As a recipient of Federal funds, Harvard's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41. Furthermore, as an educational institution which permits students to pay education-related costs with the assistance of Federal grants and loans and has done so at all times relevant to the claims asserted in this Complaint, Harvard is a recipient of Federal financial assistance sufficient to invoke Section 504 coverage. 34 C.F.R. § 104.3(h).

85.     Section 504 implementing regulations promulgated by the U.S. Department of Education ("DOE regulations") further provide that recipients of Federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate against an otherwise qualified person with a disability by providing them with an opportunity to participate in or benefit from an aid, benefit, or service that is different, separate, not equal, or not as effective as that which is afforded others. 34 C.F.R. §§ 104.4(b)(1)(i)–(iv).

86.     DOE regulations prohibit recipients of Federal financial assistance from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

87.     DOE regulations provide that no qualified student with a disability shall, on the

25

basis of disability, be excluded from participation in, denied the benefits of, or otherwise

subjected to discrimination under any academic, research, housing, health insurance, counseling,

financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid,

benefits, or services. 34 C.F.R. § 104.43(a); *see also* 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

88.     DOE regulations require recipients of Federal financial assistance to make

reasonable accommodation to the known physical or mental limitations of an otherwise qualified

individual with a disability, including such modifications to academic requirements as are

necessary to ensure that the requirements do not discriminate or have the effect of discriminating

against a qualified student with a disability on the basis of disability. 34 C.F.R. §§ 104.12,

104.44(a).

89.     Harvard has violated Section 504 by denying Harvard student members of

S4MHJ the benefits of their programs, services, and activities on the basis of disability.

90.     Harvard has violated Section 504 by failing to make reasonable accommodations

to the known mental health disabilities of its otherwise qualified students, including to its

policies addressing campus exclusion and return to campus following mental health-related

inpatient treatment or hospitalization.

91.     As a proximate result of Harvard's violations of Section 504, Harvard student

members of Plaintiff S4MHJ have been injured as set forth herein.

92.     Because Harvard's discriminatory conduct presents a real and immediate threat of

current and continuing violations, declaratory and injunctive relief are appropriate remedies

pursuant to 29 U.S.C. § 794a.

93.     Plaintiff and its members have no adequate remedy at law and unless the relief

requested herein is granted, Harvard student members of S4MHJ will suffer irreparable harm in

that they will continue to be discriminated against and denied equal access to, and an equal

opportunity to benefit from and participate in, Harvard's programs and services. Consequently,

Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C.

§§ 794a(a)(2), 794a(b).

94.    WHEREFORE, Plaintiff requests relief as set forth below.

## THIRD CAUSE OF ACTION

**Violation of the Massachusetts Equal Rights Act,**
**M.G.L. c. 93 § 103, *et seq*.**

95.    Plaintiff realleges and incorporates herein all previously alleged paragraphs of this

Complaint.

96.    The Massachusetts Equal Rights Act ("MERA") provides that "Any person within

the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-

one B, shall, with reasonable accommodations, have the same rights as other persons to make

and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property,

sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for

the security of persons and property, including, but not limited to, the rights secured under

Article CXIV of the Amendments to the Constitution." Massachusetts General Law chapter 93 §

103.

97.    Article CXIV of the Massachusetts Constitution holds that "No otherwise

qualified handicapped individual shall, solely by reason of his handicap, be excluded from

participation in, denied the benefits of, or be subject to discrimination under any program or

activity within the commonwealth." Mass. Cons. Art. CXIV.

98.    As individuals with mental health disabilities, impacted members of Plaintiff

S4MHJ qualify as "handicapped persons" under M.G.L. c. 151B because each has, has a record

of having, or has been regarded as having "a physical or mental impairment which substantially limits one or more major life activities" such as caring for one's self, learning, and working. *See* M.G.L. c. 151B §§ 1(17), (20).

99.    Harvard is an education establishment within the jurisdiction of the state of Massachusetts, and as such is obligated to comply with the provisions of Mass. Cons. Art. CXIV and M.G.L. c. 93 § 103.

100.    Harvard has violated and continues to violate the MERA and Massachusetts Constitution by excluding students with mental health disabilities from fully and equally enjoying Harvard's programs and activities.

101.    As a proximate result of Harvard's violations of the MERA and Massachusetts Constitution, members of Plaintiff S4MHJ who are Harvard students have been injured as set forth herein.

102.    Plaintiff has no adequate remedy at law and unless the relief requested herein is granted, Plaintiff will suffer irreparable harm in that its Harvard student members will continue to be discriminated against and denied access to Harvard's programs and activities. Consequently, Plaintiff is entitled to injunctive and appropriate equitable relief, as well as reasonable attorneys' fees and costs. M.G.L. c. 93 §§ 103(b, d).

103.    WHEREFORE, Plaintiff requests relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of the Fair Housing Act,
### 42 U.S.C. § 3601, *et seq.*

104.    Plaintiff realleges and incorporates herein all previously alleged paragraphs of this Complaint.

105.    The Fair Housing Act prohibits discrimination in the terms, conditions, sale, or

rental of a dwelling, on the basis of disability. 42 U.S.C. § 3604(f)(1)–(2); *see also* 24 C.F.R. §§ 100.20, 100.60(a), 100.60(b)(2).

106.    As persons with mental health disabilities, impacted members of S4MHJ are protected from discrimination under the Fair Housing Act. 42 U.S.C. § 3602(h); *see also* 24 C.F.R. § 100.201.

107.    Harvard's residence halls are covered "dwellings" under the Fair Housing Act. *See* 42 U.S.C. § 3602(b), (c); *see also* 24 C.F.R. § 100.201.

108.    The Fair Housing Act prohibits discrimination in the form of refusing to make reasonable accommodations in rules, policies, practices, or services, when such may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

109.    The Fair Housing Act also prohibits making, publishing or printing any notice or statement with respect to the sale or rental of a housing accommodation that indicates a preference, limitation or discrimination on the basis of disability. 42 U.S.C. § 3604(c).

110.    Housing and Urban Development ("HUD") regulations implementing the Fair Housing Act clarify that prohibited actions include using different criteria, standards, requirements, rental procedures, or lease or contract provisions, because of disability. 24 C.F.R. §§ 100.60(b)(4), 100.65(b)(1).

111.    Prohibited actions further include limiting the use of a dwelling's privileges, services, or facilities, or evicting tenants because of disability. 24 C.F.R. §§ 100.60(b)(5), 100.65(b)(4).

112.    Harvard has violated the Fair Housing Act by maintaining and implementing terms and conditions of housing that exclude and otherwise discriminate against S4MHJ

members who are Harvard students on the basis of disability, namely, by excluding students from mental health disabilities from, and preventing them from regaining access to, their student housing after being hospitalized for mental health related reasons or receiving inpatient mental health treatment.

113.    Harvard has further violated the Fair Housing Act by refusing to make reasonable accommodations in rules, policies and services, when such accommodations may be necessary to afford S4MHJ members who are Harvard students equal opportunities to use and enjoy their student housing.

114.    Harvard has violated HUD regulations implementing the Fair Housing Act by utilizing criteria, standards, and requirements that discriminate against S4MHJ Harvard student members on the basis of disability, including by requiring them to submit personal statements and medical documentation in advance of being readmitted to student housing when returning from a mental health related leave of absence, hospitalization, or inpatient treatment.

115.    As a proximate result of Harvard's violations of the Fair Housing Act, Plaintiff's Harvard student members have been injured as set forth herein.

116.    Because Harvard's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to the Fair Housing Act.

117.    Plaintiff has no adequate remedy at law and unless the relief requested herein is granted, Plaintiff's Harvard student members will suffer irreparable harm in that they will continue to be discriminated against and denied access to Harvard's programs and services. Consequently, Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c).

118.    WHEREFORE, Plaintiff requests relief as set forth below.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, on behalf of its Harvard student members, requests:

a.  An order finding and declaring that Defendants' acts, omissions, policies, and practices as challenged herein are unlawful;

b.  That Defendants be enjoined from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Massachusetts Equal Rights Act, and the Fair Housing Act;

c.  That Defendants be ordered to eliminate their discriminatory policies and practices with respect to the exclusion of students with mental health disabilities from campus, and adopt policies and procedures sufficient to remedy the violations complained of herein, including by conducting individualized assessments and implementing reasonable accommodations or modifications;

d.  An award of reasonable attorneys' fees and costs; and

e.  Such other relief that the Court deems just and proper.

Dated: May 21, 2025                                DISABILITY RIGHTS ADVOCATES

By:    _____
       Thomas Zito (BBO# 679136)
       2001 Center St., Third Fl.
       Berkeley, CA 94704
       Tel: (510) 665-8644
       Fax: (510) 665-8511
       tzito@dralegal.org

       Madeleine Reichman*
       655 Third Avenue, Suite 2619
       New York, NY 10017
       Tel.: (212) 644-8644
       Fax: (212) 644-8636
       mreichman@dralegal.org

31

By:    /s/ Robert L. Schug
Robert L. Schug, MN Bar No. 0387013*
Martin A. Sandberg, MN Bar No. 0505090*
NICHOLS KASTER, PLLP
4700 IDS Center
80 S. 8th Street
Minneapolis, MN, 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
schug@nka.com
msandberg@nka.com


*Counsel for Plaintiff*

*\*Motion for Pro Hac Vice Admission
forthcoming*

32