## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Students 4 Mental Health Justice,

    Plaintiff,

        v.

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE a/k/a the Harvard
Corporation d/b/a Harvard University,

    Defendant.

Civil Action No. 1:25-cv-11452

**LEAVE TO FILE EXCESS PAGES
GRANTED ON OCTOBER 27, 2025.**

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S MOTION TO DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

## INTRODUCTION

Harvard College ("Harvard" or the "College") [1] endeavors to support all students and their ability to thrive and be safe. The student population of the College, like the student population of all schools, includes individuals who have mental health-related diagnoses prior to matriculation as well as students who experience mental health issues for the first time while at school. Harvard has a plethora of resources available to students experiencing mental health challenges, including without limitation the Counseling and Mental Health Services at Harvard University Health Services ("CAMHS"), which provides individual counseling, group therapy, peer counseling, referrals to off-campus providers, and a 24/7 hotline, among other services.

When a student experiences a mental health crisis while enrolled at Harvard College, Harvard engages with the student to make an individualized assessment about the student's safety and ability to function in and among the school community.  Harvard is guided in this assessment by its policies, including those set forth in the Harvard College Student Handbook (the "Handbook").  Although the Complaint in this case purports to take issue with Harvard's policies and processes related to student mental health, it conspicuously fails to cite to a single provision of the Handbook.  Instead, the Complaint makes a number of broad—and inaccurate—generalizations about Harvard's practices, leaving the reader to guess the provisions to which Plaintiff objects and the remedies it seeks through this litigation.

However, the Court need not reach these deficiencies because, as explained below, Plaintiff Students 4 Mental Health Justice ("S4MHJ") does not have standing to proceed with this litigation as the Complaint fails to establish the requirements of associational standing

---

[1] Although the Complaint in this matter purports to seek broad relief from defendant President and Fellows of Harvard College, all of its allegations pertain to Harvard College—Harvard's undergraduate program—and Harvard College students.

pursuant to *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977). Specifically, the Complaint fails to establish that at least one of S4MHJ's members would have standing to sue individually, and further fails to demonstrate that the case can be adjudicated efficiently without the participation of S4MHJ's individual members. Accordingly, the Complaint should be dismissed in its entirety.

If, however, the Court concludes otherwise, Harvard requests in the alternative that the Plaintiff be ordered to amend its Complaint to provide, at a minimum, the information needed to put Harvard on notice of the claims against it, including: which of Harvard's policies or processes purportedly are unlawful; which statute(s) each of those policies or processes allegedly violate; whether any of S4MHJ's members are currently or will be imminently subject to these purportedly unlawful policies or processes; the date(s) when any prior violations purportedly occurred; and the specific remedies sought. Without such information, it is not possible for Harvard to respond to the Complaint.

**BACKGROUND**

I.    **Harvard College Policies**[2]

A.    *Voluntary and Involuntary Leaves of Absence from Harvard College*

The Complaint purports to describe five Harvard students' individual experiences involving emergency room visits, hospitalization, inpatient and/or outpatient treatment prompted

---

[2] "[I]t is well-established that in reviewing the complaint, [the Court] 'may properly consider the relevant entirety of a document *integral to or explicitly relied upon* in the complaint ... without converting the motion into one for summary judgment.'" *Clorox Co. v. Proctor & Gamble Commer. Co.,* 228 F.3d 24, 32 (1st Cir. 2000) (citations omitted) (emphasis added). When a such a document conflicts with the allegations in the complaint, the document "trumps the allegations." *Hogan v. Teamsters Loc. 170*, 495 F. Supp. 3d 52, 58 (D. Mass. 2020) (citations omitted).

by acts of self-harm, threats to members of the community, or stated intentions to die by suicide, among other concerns.

The College does not have a "one size fits all" policy for students experiencing serious medical issues, including mental health issues; rather, it takes an approach tailored to a student's individual circumstances. One available option is to take a voluntary leave of absence. As set forth in the Handbook, students who seek to take a voluntary leave of absence for medical reasons are generally permitted to do so. *See* Exhibit 1, Handbook, p. 43, ¶¶ 6-7. At the time that the student requests a medical leave of absence, the College ordinarily will consult with Harvard University Health Services ("HUHS"), and, following an individualized assessment, then may "require students to comply with a treatment plan determined by their health care provider during their time away and set out specific expectations for them to meet before they may return to the College with the goal of ensuring their readiness to return." Handbook, p. 43, ¶ 2. Students are provided with explanatory materials when they take a leave of absence, and are encouraged to consult these materials and their Resident Dean[3] about how to approach such expectations. *Id.*

As set forth in the Handbook, certain circumstances may warrant an involuntary leave of absence. These include, for example, serious medical situations (involving both physical and mental health), alleged criminal behavior, risk to the community, failure to provide medical documentation of required immunizations, failure to pay a term bill, or other unfulfilled school requirements. *Id.*, pp. 43-45. Medical circumstances may warrant an involuntary leave of absence where: "(a) the student's behavior poses a direct threat to the health or safety of any

---

[3] At Harvard, Resident Deans are staff members who live on campus with the students to whom they are assigned and who support students in academic, social, and extracurricular matters.

person, or has seriously disrupted others in the student's residential community or academic environment, and (b) either the student's threatening, self-destructive, or disruptive behavior is determined to be the result of a medical condition or the student has refused to cooperate with efforts by [HUHS], or other clinicians, to determine or evaluate the cause of the behavior." *Id.*, p. 44, ¶ 1(I). An involuntary leave of absence also may be imposed for medical reasons where a student is not cleared to return to enrollment or residence at Harvard College following either: "(a) a hospitalization or emergency room visit that raises serious concerns about the student's health or well-being; or (b) other circumstances that raise serious concerns about the student's health or well-being and reasonably call into question their ability to function as a student in the Harvard College environment." *Id.*, p. 44, ¶ 1(II). In such circumstances, as spelled out in the Handbook, the College makes "its own assessment of the suitability of the student's return." *Id.*, p. 90, Clearance to Return.[4] In addition, a student might be placed on an involuntary leave of absence if the student's enrollment or residence is "conditioned on the student's agreement to meet the expectations set forth in an agreement to engage in treatment . . . and the student has failed to adhere to the terms of that agreement." *Id.*, p. 44, ¶ 2.

The decision to place a student on an involuntary leave is made by the Dean of Students in consultation with the student's Resident Dean and, as appropriate, with other officers of the

---

[4] The Complaint pejoratively mischaracterizes the period during which this assessment about returning to campus takes place as a "campus ban." *See, e.g., Compl*. ¶¶ 18, 34-35. In reality, as the Handbook makes clear, although the student cannot return to campus while the College conducts an individualized assessment about their safety and ability to function in the College environment, this is not a "ban"—it is the brief period during which the College is conducting its clearance to return process. Some students are cleared to return immediately; others are not cleared to return; and some are cleared to return on certain conditions, as explained herein.

University or with the Administrative Board ("Ad Board"[5]).  *Id.*, p. 45.  As stated in the

Handbook:

> "The decision to place a student on an involuntary leave of absence for health-related reasons is made in consultation with [HUHS] (which may consider information from the student's current and/or former health care providers, if made available by the student), after an individualized assessment of all of the pertinent factors, such as the nature of the student's conduct; the nature, duration and severity of the risk; the likelihood of potential injury; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk, such as a reduced course load or course modifications. However, reasonable modifications do not include changes that would fundamentally alter the academic program or unduly burden the College's resources or staffing capabilities or, with respect to the required level of care or monitoring, that would exceed the standard of care that a university health service or the staff of a residential college can be expected to provide."

*Id.*, p. 44, ¶ 1.  A decision to place a Harvard College student on involuntary leave of absence is

communicated to the student in writing.  Students may appeal the decision "to an appeal

committee chaired by the Dean of the College and composed of representatives from College and

University offices generally within five calendar days." *Id.*, p. 45.

Students who are placed on leave for any reason are expected to vacate University

property within five business days, and may not store their belongings at the University.  *Id.*

Students who are placed on an involuntary leave "may at any time consult their Resident Dean or

their designated contact person at the College." *Id.*, p. 46.  When students who have health

insurance through Harvard go on leave, they have the option to extend their insurance for up to

six months.[6]

---

[5] Among other responsibilities, the Ad Board oversees certain aspects of Harvard student conduct and academic standards.  *See* https://oaisc.fas.harvard.edu/administrative-board/.

[6] *See* Harvard University Student Health Program Policies, available at https://hushp.harvard.edu/policies-and-forms/ ("Students may apply for six months of additional coverage due to Leave of Absence or Withdrawal from the University.").

**B.    *Petitions to Return from a Medical Leave of Absence.***

Harvard College students seeking to return from a voluntary or involuntary leave for medical reasons (whether physical or mental health), "must petition the Administrative Board for permission to return and must demonstrate that the circumstances that led to their leave have been satisfactorily addressed and they are ready to resume their studies."  Handbook, p. 47.

To facilitate an individualized assessment of the student's circumstances, students on medical leave ordinarily are "required to consult with [HUHS] (and to grant permission to [HUHS] to obtain their relevant treatment records and communicate with their treatment providers)."  *Id.*, p. 47, ¶ 2.  This consultation with HUHS is done "so that a professional assessment about the student's productivity during their time away and readiness to return can be shared with the College, including the student's participation and progress with appropriate health care providers during their time away."  *Id.*  Students also must provide evidence of productivity during their time away, which includes "a written statement describing how the student's time away has been spent," and "may include a substantial period of regular employment at a non-academic job and a suitable letter of recommendation from the employer, employment, or volunteer supervisor." *Id.*

**C.    *Agreements to Engage in Treatment.***

As set forth in the Handbook:

> The College may make conditional a student's enrollment and/or residence on certain terms or conditions, as set forth in a written agreement between the College and the student, when the student's conduct or circumstances have caused heightened concerns about the student's safety and/or well-being and: (a) the appropriateness of the student's continued enrollment and/or residence; or (b) the student's readiness to return to the Harvard community. The agreement to engage in treatment may include, among other things, compliance with a medical treatment plan, regular consultations with health care professionals, communication with administrators, and limited disclosure of relevant medical information, on a need-to-know basis, such as compliance with treatment and

restrictions on certain activities. The decision to require such an agreement is arrived at in consultation with [HUHS] after an individualized assessment of the nature of the student's conduct and circumstances and any other pertinent factors.

Handbook, p. 49. Agreements to engage in treatment ("AETs") allow a student to be enrolled and in residence and are intended to ensure that appropriate supports remain in place. AETs include the identity and contact information for a student's treatment team but <u>do not</u> require a student to disclose specific medical information to the College. Rather, they are agreements between the College and the student pursuant to which the student agrees to follow the recommendations of their treatment team, and the various members of the treatment team are permitted to communicate concerns to one another, and to confirm to the College and CAMHS that the student is continuing to engage in treatment and is following the recommendations of their treatment team. *Id*.[7]

### D. **Policies Regarding Student Medical Records and Consultation with HUHS About Students.**

As the Handbook makes clear, HUHS has two distinct responsibilities: (1) medical care and medical decision-making; and (2) consultation to the College. Handbook, pp. 88-89. When providing medical care, HUHS "preserves the rights to privacy and confidentiality of students under its care, communicating with others about students only with those students' knowledge and consent," except in very limited and clearly delineated circumstances.[8] *Id.*, p. 88. When

---

[7] Attached as Exhibit 2 is a sample AET, agreed and entered into by Student E.

[8] Specifically, if a student's medical condition or behavioral disturbance "poses a danger to the student or threat to others in the community," HUHS professional staff may disclose relevant information to appropriate people "for the purpose of protecting the student, others, or the community from harm." *Id.* HUHS also will notify the College when it is aware of a student's hospitalization, or transfer to an emergency department, but "ordinarily will disclose only that the student is safely in care." *Id.*, p. 89. "[I]nformation regarding diagnosis or treatment is not shared." *Id.*

acting in a consultive role, HUHS advises the College about "individual students' needs, ordinarily with students' full knowledge and consent." *Id*. As the Handbook provides, "[t]hree situations that routinely call for close coordination and consultation between HUHS and the College involve accommodations for students experiencing difficulties, clearance to return to residence and enrollment, and leave of absence considerations." *Id.* When asked to do so, HUHS clinicians "may evaluate a student's condition and make recommendations to the College," but "will not ordinarily disclose information they know independently about a student's medical or mental health condition without the student's consent and, in all cases, will not disclose information about a student that is not relevant to the recommendations." *Id.*

In all instances, including when a mental health crisis has occurred and an individual assessment must be completed as part of the clearance to return process, a student may refuse to allow communication between their treating clinician(s) and HUHS, in its role as consultant to the College. *Id.*, p. 91. If a student declines to permit their treating clinician(s) to communicate with the College, then the College necessarily must proceed with its assessment and decision-making regarding the student, but will do so without the benefit of the student's current treating clinicians' recommendations.

## II. <u>Students 4 Mental Health Justice</u>

S4MHJ is not a Harvard-recognized student organization. It is not an incorporated 501(c)(3) organization. It appears to have no bylaws, and its Organizational Roadmap notes that it is "not attempting to build a fully-staffed non-profit, nor a temporary campus organization."[9]

---

[9] *See* Students 4 Mental Health Justice Organizational Roadmap, available at https://docs.google.com/document/d/1r3H_Ko1VoWDYkbG6ePnXRgDPdVGKlWl8ekL4w5XCo4E/edit?tab=t.0, at 2.

Neither the Complaint nor publicly-available information specifies how many of S4MHJ's members are Harvard College students or whether its other members have any connection to Harvard.

S4MHJ alleges that it is:

> "…a community of neurodivergent and mentally ill people, with a current membership of approximately 30, most of whom are current Harvard students with mental health disabilities who have been directly harmed by Harvard's discriminatory policies, practices, and procedures, and continue to be subject to them. Many S4MHJ members, including Students A, B, C, D, and E, have mental health conditions that substantially limit one or more major life activities, including sleeping, eating, learning, thinking, concentrating, and living, and/or major bodily functions, including brain, neurological, or cognitive functions."

*Compl.*, ¶ 13.  S4MHJ asserts that the purpose of its community is "to ensure all are included in higher education, by generating community-driven research, working in policy-making systems, and fostering solidarity among students forced underground by discriminatory policies."  *Id.*, ¶ 12.  It alleges that its projects include "researching university leave of absence policies and advocating for state legislation protecting higher education students with mental health disabilities" and that it is bringing this lawsuit "on behalf of its members in the Harvard community with mental health disabilities to change these discriminatory policies and to protect their members and others from the current and future discrimination."  *Id.*, ¶¶ 14-15.

## III.    Claims Asserted in this Litigation

S4MHJ asserts four counts against Harvard in this matter: Violation of the Americans with Disabilities Act ("ADA") (Count One); Violation of the Rehabilitation Act (Count Two); Violation of the Mass. Equal Rights Act (Count Three); and Violation of the Fair Housing Act ("FHA") (Count Four).  The Complaint does not seek monetary damages for Plaintiff or its members but rather seeks declaratory and injunctive relief (and attorneys' fees).  *Compl.*, p. 31.

**STANDARDS OF REVIEW**

A motion to dismiss based on a lack of standing arises under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Blum v. Holder*, 744 F.3d 790, 795–96 (1st Cir. 2014). "'The party invoking federal jurisdiction bears the burden of establishing' standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). To establish associational standing, an organization must demonstrate that: (a) at least one of its members would have standing to sue individually; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).

As an individual, a plaintiff bringing a claim under Title III of the ADA for injunctive relief must sufficiently allege an injury in fact, meaning an "injury or threat of injury [that is] both real and immediate[.]" *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983) (citations and quotations omitted). The plaintiff "must 'show a real and immediate threat that a particular (illegal) barrier will cause future harm." *Norkunas v. Sandeep Partners, LLC,* No. CV 17-12089-PBS, 2018 WL 2727899, at *2 (D. Mass. June 5, 2018) (citations omitted). "Showing a risk of future harm is essential because, in general, injunctive relief requires 'continuing, present adverse effects' and cannot be shown by mere '[p]ast exposure to illegal conduct.'" *Id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 495–96 (1974)).

**ARGUMENT**

I.    **S4MHJ Does Not Allege Sufficient Facts to Establish its Ability to Sue as a Traditional Membership Organization.**

S4MHJ appears to assume—but, significantly, does not allege—that it is a "traditional membership organization" entitled to bring suit. *In re Fin. Oversight & Mgmt. Bd. for Puerto*

*Rico*, 110 F.4th 295, 311 (1st Cir. 2024). S4MHJ fails to allege any facts providing the minimal

information necessary to establish its purported organizational identity. Although the United

States Supreme Court has stated that where a plaintiff organization is "indisputably a voluntary

membership organization with identifiable members," no further scrutiny of how the

organization operates is required, *see Students for Fair Admissions, Inc. v. President and Fellows

of Harvard College*, 600 U.S. 181, 201 (2023) ("*SFFA*"), no such "indisputable" information

exists as to S4MHJ.

In *SFFA*, the plaintiff organization's "indisputable" status as a traditional membership

organization arose out of facts pled, and then proven, demonstrating that SFFA was a 501(c)(3)

non-profit with bylaws and with members who voluntarily joined to support SFFA's mission.

*See SFFA*, 600 U.S. at 198-99 (citing *Students for Fair Admissions, Inc. v. Univ. of Texas at

Austin,* 37 F.4th 1078, 1084 (5th Cir. 2022)). By contrast, S4MHJ alleges only that it is a

"student-led membership advocacy group," "with a current membership of approximately 30"

people of whom "many" or "most" are current Harvard students. *Compl.*, ¶¶ 8, 13. The group

appears to have no bylaws and, as noted above, its "Organizational Roadmap" includes a

"leadership plan" stating that S4MHJ is "not attempting to build a fully-staffed non-profit, nor a

temporary campus organization."[10] S4MHJ does not allege (because it cannot) that it is a

Harvard-recognized student organization. It claims to exist in order to organize "against

discriminatory and *borderline illegal* mental health policies at Harvard and other universities."[11]

---

[10] *See* Students 4 Mental Health Justice Organizational Roadmap, available at
https://docs.google.com/document/d/1r3H_Ko1VoWDYkbG6ePnXRgDPdVGKlWl8ekL4w5XC
o4E/edit?tab=t.0, at 2.

[11] *See* @students4mhjustice, *Instagram* (Aug. 16, 2024), https://www.instagram.com/p/C-
vodiMS9LC/?utm_source=ig_web_copy_link&igsh=dTNwMW56Z2JlZDBp (emphasis added).

These allegations are not sufficient to establish S4MHJ as a "traditional membership organization." *See Small Sponsors Working Grp. v. Pompeo,* No. 1:19-2600-STA-JAY, 2020 WL 2561780, at *6 (W.D. Tenn. May 20, 2020) (plaintiff, an unincorporated group, "has not presented facts showing that it has standing to bring this suit on behalf of its members" where it did not allege that it had a board of directors, a written mission statement, or members with the same level of interest; plaintiff thus was not a "traditional membership organization" but rather was a "loose knit association"); *Heap v. Carter*, 112 F. Supp. 3d 402, 418 (E.D. Va. 2015) (plaintiff lacked associational standing because it alleged only that "it maintains an active membership, including members who are enlisted in the United States Navy" and did not allege "any information that would allow the Court to find that it has the kind of leadership and financial structure that is closely tied to that of its members or that its members exert any control over the direction of the organization"); *see also Concerned Citizens of West Tennessee v. United States Dept. of Agriculture*, No. 1:22-cv-01274-STA-jay, 2024 WL 313647, at *8 (W.D. Tenn. Jan. 26, 2024) (plaintiff was found to be a traditional membership association because it was incorporated under the state's nonprofit act and had a charter and bylaws setting out its membership criteria and an elected Board of Directors that owed fiduciary duties of loyalty and good faith to the members and the corporation). Though it is not an onerous burden to show sufficient traditional membership, S4MHJ has not met that burden. Accordingly, Plaintiff has failed to establish its ability to sue, and the Complaint should be dismissed for that reason alone.

## II.    <u>Plaintiff Fails to Otherwise Meet the Requirements for Associational Standing.</u>

But even if S4MHJ is deemed to have alleged sufficient indicia of a traditional membership organization, the case nonetheless must be dismissed because S4MHJ lacks associational standing. In cases where an organization seeks to serve as a plaintiff, the standing

requirements of Art. III of the Constitution may be satisfied by asserting associational standing, that is, "standing solely as the representative of its members," as opposed to standing based on an injury to the organization itself. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To invoke associational standing, an organization must demonstrate that: (a) at least one of its members would have standing to sue individually; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) the claims and types of relief requested do not require individual participation of the members. *Hunt*, 432 U.S. at 342-43.[12] In addition, the organization must face real, tangible harm. *Id.* "A mere interest in an event—no matter how passionate or sincere the interest and no matter how charged with public import the event—will not substitute for an actual injury." *United States v. AVX Corp.,* 962 F.2d 108, 108 (1st Cir. 1992).

Here, S4MHJ fails to meet the requirements for associational standing for at least two reasons: (1) it fails prong (a) of the *Hunt* test because it does not allege sufficient facts to suggest that at least one of its members would have standing to sue individually; and (2) it fails prong (c) because it asserts claims and types of relief that necessarily require the individual participation of its members. Accordingly, the case should be dismissed in its entirety with prejudice.

A. ***Plaintiff Has Not Alleged Facts Supporting the Requirement that At Least One of its Members Would Have Standing to Sue Individually.***

The Complaint fails to provide basic information about the policy provisions S4MHJ claims are unlawful, and further fails to identify which statute(s) each provision purportedly violates. Although insufficient to put Harvard on notice of the claims against it, *see infra* at Part

---

[12] Associational standing under the ADA and the Rehabilitation Act ("RA") is analyzed using the test set forth in *Hunt*. Although no case in this Circuit appears to have yet applied the *Hunt* test for associational standing to claims under the FHA, other circuits have done so for both the FHA and the RA. *See, e.g., Tenth Street Residential Ass'n v. City of Dallas*, 968 F.3d 492 (5th Cir. 2020) (applying test to FHA claim); *Disability Advocates, Inc. v. NY Coalition for Quality Assisted Living, Inc.,* 675 F.3d 149 (2d Cir. 2012) (applying test to RA and ADA claim).

III, the sections of the Complaint recounting purported student experiences make clear that S4MHJ does not have standing because the organization fails to allege that at least one of its members would have individual standing.  Because S4MHJ fails the first prong of the associational standing test under *Hunt,* the case must be dismissed.

        1.      <u>The Applicable Legal Standard for Students A-E</u>

Under *Hunt*, an organization seeking to establish associational standing must demonstrate that at least one of its members would have standing to sue individually.  *See* 432 U.S. at 343. An injury in fact under Article III of the Constitution requires a plaintiff to allege "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560  (citations and internal quotation marks omitted).  To validly establish a right to injunctive relief under the ADA, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.* at 564 (quoting *Lyons*, 461 U.S. at 102); *Blake v. Southcoast Health Sys., Inc.*, 145 F. Supp. 2d 126, 136 (D. Mass. 2001) ("'Nothing in the ADA or its legislative history suggests an intent to allow individuals . . . to obtain injunctions on the basis of past wrongdoing alone.' . . . Indeed, Title III's structure gives rise to the inference that Congress intended that private litigants only be able to seek redress for <u>future</u> injuries.") (citations omitted) (emphasis in original).

The ADA recognizes deterrence as a cognizable injury in circumstances where harm is imminent.  For example, "'a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA' and 'who is threatened with harm in the future because of **existing or imminently threatened** noncompliance with the ADA' suffers actual or **imminent harm** sufficient to confer standing."

*Disabled Americans For Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005) (quoting *Pickern v. Holiday Quality Foods, Inc.,* 293 F.3d 1133, 1138 (9th Cir. 2002)) (emphasis added).  Likewise, the FHA requires either a current housing injury or a well-founded "belie[f] that [a] person will be injured by a discriminatory housing practice that is **about to occur**." 42 U.S.C. 3602(i) (emphasis added).

S4MHJ seeks only declaratory and injunctive relief for itself and its members.  *See Compl.*, p. 35.  These, of course, are forms of prospective relief.  *See Meggs v. Dillon Companies, LLC*, No. 21-CV-02030-NYW, 2022 WL 4079337, at *6 (D. Colo. Sept. 6, 2022). "[T]o establish injury in fact for purposes of prospective relief, a plaintiff must "be suffering a continuing injury or be under a real and immediate threat of being injured in the future."  *Id.* (citing *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004)).

> 2.    The Allegations Concerning Harvard Students A-E Do Not Establish
>        Individual Standing.

None of the students whose experiences are recounted in the Complaint allege a cognizable injury sufficient to confer standing upon S4MHJ.

> i.    *Allegations About Student A*

S4MHJ alleges that Student A agreed to take a voluntary medical leave of absence following a mental health-related hospitalization in December 2022.  *Compl.*, ¶ 17.  S4MHJ further alleges that she had to petition to return to school and was required to comply with the terms of an "HUHS Rider."  *Id.*, ¶ 19.  Student A successfully returned to campus in the fall of 2023.  *Id.*, ¶ 21.  S4MHJ alleges that upon Student A's return, Harvard staff at CAMHS requested the names of her mental health treatment providers, but "[i]n order to preserve her medical privacy, Student A is receiving off-campus mental health treatment."  *Id*.  S4MHJ alleges that

15

Student A "would prefer to use on-campus mental health treatment providers but does not because those on-campus providers report to Harvard Administrators." *Id.*

Even accepting the allegations about Student A as true for purposes of this standing analysis, they are insufficient to establish standing for S4MHJ. S4MHJ appears to allege (but does not specifically state) that Student A's purported initial leave was unlawful. *See Compl.*, ¶ 17. However, in a Complaint seeking only prospective relief, Plaintiff cannot rely on past injury but instead must allege "a continuing injury" or "a real and immediate threat of being injured in the future." *Meggs,* 2022 WL 4079337, at *6; *see also Guckenberger v. Bos. Univ.,* 957 F. Supp. 306, 320–21 (D. Mass. 1997) (holding that certain organizations did not have standing where they claimed to represent students or potential students of Boston University but did not allege that any of their members were "suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case[.]").

Moreover, S4MHJ does not allege that Student A has been excluded from any Harvard program or service as a result of her disability since returning to campus two years ago, nor that any such exclusions are imminent. *Compl.*, ¶ 21. There is no allegation that Student A suffered any injury as a result of an alleged request for the names of her providers, nor does she allege that Harvard has renewed that request at any time in the last two years. Indeed, Student A's only current "injury," as alleged, is that she is choosing to receive mental health treatment from off-campus providers because she believes on-campus providers "report to Harvard Administrators." *Id.* She appears, in other words, to rely upon a theory of deterrence.

However, in the ADA context, deterrence can confer standing only where "a defendant's failure to comply with the ADA" is the cause of deterrence or where the plaintiff "is threatened with harm in the future because of existing or imminently threatened noncompliance with the

ADA." *Disabled Americans For Equal Access, Inc.,* 405 F.3d at 64 (citation omitted).  Here, the only alleged fact or circumstance deterring Student A from accessing treatment from on-campus providers is the allegation that those providers "report to Harvard Administrators."  *Compl.*, ¶ 21. There is, however, no allegation that Harvard is engaging in an ADA violation that is deterring Student A from accessing on-campus providers.

Likewise, Student A's allegations do not state a claim for relief under the FHA.  S4MHJ seeks only injunctive relief, and Student A does not allege that she is being excluded from housing now or that any discriminatory housing practice is "about to occur[.]"  42 U.S.C. 3602(i).[13]  Accordingly, nothing alleged by S4MHJ about Student A indicates that Student A would have standing to sue individually such that the organization has associational standing.

ii.      *Allegations About Student B*

S4MHJ alleges that in the fall semester of 2022, Student B, then a first-year student with a mental health disability, went to the emergency room for mental health reasons related to an eating disorder.  *Compl.*, ¶¶ 22, 57.  S4MHJ alleges that Student B was required to petition to return to Harvard for the 2023 spring semester, which she did with success.  *Id.*, ¶ 26.  S4MHJ further alleges that Student B's return to school was subject to an AET which allegedly:

> required Student B to sign another HIPAA release of all medical information to Harvard officials, allow Harvard to contact her treating providers on an ongoing basis, continue taking prescribed medications, attend all appointments with her treatment team, comply with all recommendations of her treatment team, submit to on-demand psychological evaluation by Harvard, and abstain from

---

[13]  Because none of the students whose experiences are recounted in the Complaint allege a current or imminent housing injury, S4MHJ fails to establish standing under the FHA.  For ease of the Court's review, Harvard will not repeat this conclusion as to each student.

> the use of drugs and alcohol for the duration of her attendance at
> Harvard, regardless of her age, among other requirements.

*Id*.  Plaintiff alleges that Student B was required to re-sign the treatment contract on August 29,

2023, and August 19, 2024.  *Id.*, ¶ 27.[14]

S4MHJ cannot establish standing through allegations relating to Student B because those

allegations do not identify any cognizable injury that can be redressed through the declaratory

and injunctive remedies sought in this case.  Even if the Complaint can be read to allege that

Student B's purported placement on leave following hospitalization violated the ADA or any

other statute, this is not the type of injury redressable by *prospective* relief.  *See Meggs,* 2022 WL

4079337, at *6.  Nor does S4MHJ allege that any condition of Student B's AET limits her access

to Harvard's programs or services.  In sum, S4MHJ fails to allege that Student B has suffered an

"injury in fact" sufficient to confer standing.

Although S4MHJ alleges that Student B "fears that she might be permanently barred

from Harvard and immediately evicted from on-campus housing if she has another mental health

crisis or is deemed to have violated her treatment contract in any way," a general concern that

something might happen in the future is insufficient to constitute "imminent" injury that can

confer standing.  "An actual or imminent injury is one that is 'not conjectural or hypothetical.'"

*Conservation L. Found., Inc. v. Jackson*, 964 F. Supp. 2d 152, 161 (D. Mass. 2013) (citing *Lujan,*

504 U.S. at 560).  Even "[p]ast exposure to illegal conduct does not in itself show a present case

---

[14] As is true for many of the students' allegations in the Complaint, the allegations pertaining to
Student B are not accurate.  Attached as Exhibit 3 is Student B's amended AET, which stipulates
that she may consume alcohol if she does so safely.  The AET does not require her to provide
HIPAA-protected information to Harvard officials.  *See Hogan*, 495 F. Supp. 3d at 58 (citations
omitted) (when a document invoked by the Complaint conflicts with the allegations in the
complaint, the document "trumps the allegations").  Nonetheless, even accepted as true, the
allegations about Student B do not establish standing for S4MHJ.

or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *Id.* (citing *Lujan,* 504 U.S. at 564, quoting *Lyons,* 461 U.S. at 102).  Because the allegations relating to Student B assert only future, hypothetical harm, they cannot establish standing for Student B or, consequently, for S4MHJ.

iii.      <u>Allegations About Student C</u>

When S4MHJ filed its Complaint, it alleged that Student C "is currently under a campus ban instituted by the Ad Board on May 6, 2025 after a hospitalization" pursuant to which she was "only permitted to go on campus to go to the library in order to finish her coursework and to take one final exam." *Compl.*, ¶ 34.  Since the Complaint was filed, however, Student C has graduated from Harvard.  Accordingly, the allegations concerning her cannot confer standing on S4MHJ because the only remedy requested as to students—injunctive relief—is not available to her as a former student, even if the facts alleged as to her otherwise were sufficient, which they are not. *See Harris v. Univ. of Massachusetts Lowell,* 43 F.4th 187, 192 (1st Cir. 2022) (citing *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021), quoting *Town of Portsmouth v. Lewis*, 813 F.3d 54, 58 (1st Cir. 2016)) (where students had graduated, their former university's vaccination policies no longer applied to them and case was moot because there was "no ongoing conduct to enjoin" that presently impacted the former students).

iv.      <u>Allegations About Student D</u>

S4MHJ fails to establish standing through the sole allegation pertaining to Student D, namely that she has a mental health disability and purportedly was deterred from seeking on-campus mental health treatment for suicidal ideation because she feared that she would be placed on a leave of absence and instead sought off-campus treatment. *Compl.*, ¶ 35.  There are no facts pled concerning the purported "deterrence" apart from Student D's "fears about triggering a

19

campus ban or an involuntary leave of absence" if she obtains on-campus treatment. *Id.* Indeed, the Complaint makes no factual allegations about Harvard's supposed actions to deter Student D from obtaining on-campus treatment. For the reasons set forth above in connection with Student A, Student D's fear alone does not confer standing in part because there are no allegations at all concerning what specific actions constituted purported deterrence—much less allegations that those actions violate the ADA. *See Disabled Americans For Equal Access, Inc.,* 405 F.3d at 64 (citations omitted).

v.    <u>*Allegations About Student E*</u>

S4MHJ alleges that Student E was hospitalized due to risk of self-harm in the fall of 2023. *Compl*., ¶ 36. Plaintiff further alleges that Harvard cleared Student E for re-enrollment pursuant to an AET which:

> required him to release medical information to Harvard officials, continue taking prescribed medications, attend all appointments with his treatment team, comply with all recommendations of his treatment team, submit to on-demand psychological evaluations by Harvard, and abstain from the use of drugs and alcohol for the duration of his attendance at Harvard, regardless of his age, among other requirements. The contract threatened that failure to comply with its terms, including the release of medical information to Harvard officials, could result in permanent dismissal from Harvard.

*Id.*, ¶¶ 38-39. S4MHJ alleges that Student E was required to re-sign the contract every academic year until graduation, and that Harvard takes steps to determine whether he is attending his medical appointments. *Id.,* ¶ 41.

The allegations pertaining to Student E fail to confer standing upon S4MHJ because there is no cognizable injury alleged. According to S4MHJ, following his hospital visit, Student E returned to campus immediately and was not placed on a leave of absence. *Id.*, ¶ 38. Moreover,

20

none of the conditions listed in his AET—even if accepted as alleged[15]—are alleged to limit his access, or provide him with unequal access, to Harvard's programs. To be sure, Student E takes issue with Harvard's communicating with him about missed medical appointments—despite his having signed an AET in which he agreed to attend appointments and allow communication about such attendance—but this does not suffice to constitute a "concrete and particularized" harm. *Steger v. Franco, Inc.,* 228 F.3d 889, 892 (8th Cir. 2000).

Finally, Student E's general fear of being excluded from campus in the event he has another mental health crisis is precisely the type of "conjectural or hypothetical" alleged injury that fails to confer standing. *See Conservation L. Found., Inc.*, 964 F. Supp. 2d at 161.

For all of these reasons, this case must be dismissed because S4MHJ has not established that even one of its members would have standing to sue individually.

### B.    The Claims Asserted and Remedies Sought by S4MHJ Require Individual Participation of its Members and Thus Preclude Associational Standing.

Moreover, even if S4MHJ met the first prong of the *Hunt* test—and it does not—the Complaint must be dismissed for the independent reason that S4MHJ fails prong (c) of the *Hunt* test. Specifically, Plaintiff's allegations make clear that its claims and requested relief require individual participation of the organization's members and depend entirely on the unique circumstances of each member alleging a statutory violation. This alone defeats standing. *See United Food and Comm'l Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554-58 (1996) ("*United Food*").

---

[15] Student E's agreement to engage in treatment is attached as Exhibit 2. Contrary to S4MHJ's allegations, it does not require Student E to release medical information to Harvard officials. Even on a motion to dismiss, the Court need not credit allegations that are contradicted by the document to which the allegation refers. *See Hogan*, 495 F. Supp. 3d at 58.

As pled, the Complaint's claims necessarily would require the participation of Students A-E and/or other members of S4MHJ.  The Complaint does not allege that Harvard's policies are facially unlawful, nor does it even cite to any particular Handbook provision that it claims is unlawful—indeed, S4MHJ publicly characterizes Harvard's policies as only "borderline illegal."[16]  Rather, Plaintiff appears to allege either that Harvard is not adhering to its own policies *as to individual members*, or that Harvard's practices are harmful *to specific members* in the context of those members' individual circumstances.

Accordingly, adjudication of claims about Harvard's supposedly discriminatory adherence to or application of its policies here turns on unique facts specific to each member— including each student-member's unique disabilities, hospitalizations, leaves of absence, returns, conditions on returning, housing arrangements, agreements to engage in treatment, and other specific details relevant to the individual student and Harvard's individualized assessment of that student's circumstances.  This is anathema to associational standing.  *See Parent/Pro. Advoc. League v. City of Springfield, Massachusetts,* 934 F.3d 13, 35 (1st Cir. 2019) ("*Parent/Pro.*").

In *Parent/Pro.*, the First Circuit explained that the complaint at issue concerned various facets of a special education program.  *Id.* at 35.  It further explained that the "prudential bars to representative standing sound in 'administrative convenience and efficiency.'" *Id.* (quoting *United Food,* 517 U.S. at 557).  The Court went on to conclude that where "individualized proof" was needed, an organization may lack standing to assert claims of injunctive relief.  *Id.* (citations omitted).  Specifically, the Court stated:

> [A]djudication of the claims here would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement. Efficient and successful judicial resolution of the claims would thus

---

[16] *See* @students4mhjustice, *Instagram* (Aug. 16, 2024), https://www.instagram.com/p/C-vodiMS9LC/?utm_source=ig_web_copy_link&igsh=dTNwMW56Z2JlZDBp.

> require participation and cooperation by numerous students and parents.  And, as
> we stated, representative standing is inappropriate where such participation is
> necessary.

*Id.*

Not surprisingly, undersigned counsel has not identified a single case, nationwide, that has proceeded past the dismissal stage (or similar procedural step) in which an organization, as opposed to a named individual, has asserted personal ADA claims while seeking declaratory and injunctive relief aimed at "chang[ing]" the policies of a higher education institution.  *Compl.*, ¶ 15.  There simply is a fundamental disconnect between the efficiency aims of associational standing and the participation required of the student-members of S4MHJ in this case.  Accordingly, this case should be dismissed because adjudication of S4MHJ's claims would turn on "facts specific to each student," and "representative standing is inappropriate where such participation is necessary."  *Parent/Pro.*, 934 F.3d at 35.

## III.    **In the Alternative, Plaintiff Must Provide a More Definite Statement.**

A party may "move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response."  Fed. R. Civ. P. 12(e).  A motion for more definite statement is appropriate where the Complaint suffers from "unintelligibility" that prevents the "movant from 'determining the issues he must meet.'"  *Hilchey v. City of Haverhill*, 233 F.R.D. 67, 69 (D. Mass. 2005) (citations omitted).

Here, the Complaint fails to allege the basic information necessary for Harvard to respond and defend itself.  As made clear above, the Complaint fails to quote, cite, or invoke a single Harvard policy or Handbook provision, despite repeatedly alleging that such (unidentified) "policies, practices, and procedures" are "antiquated," illegally discriminatory, onerous, and harmful.  *See Compl., passim.* For example, as to Student A alone, any of the following alleged

23

acts *could* be an act that Plaintiff claims is wrongful: placing the student on leave at all; the length of the leave; not permitting the student to take final exams on campus; requiring the student to stay off campus for some amount of time; not permitting the student on campus to retrieve certain items; requiring the student to petition the Ad Board to return to campus; terminating the student's health insurance; and/or requiring the student to share the names of her medical providers. *See id.*, ¶¶ 17-21. As currently pled, however, it is unclear which of these (if any) form the basis of S4MHJ's claims. The same is true for each of the students whose alleged experiences are described in the Complaint.

In addition, even if it *were* possible to glean precisely which policies or practices are claimed to be wrongful (and it is not), the Complaint does not indicate which statute(s) each of the purportedly wrongful acts allegedly violates. Indeed, the remedies sought in the Complaint are hopelessly vague. For example, Plaintiff seeks a declaratory judgment that Harvard's "acts, omissions, policies, and practices as challenged herein are unlawful," without identifying those "acts, omissions, policies, and practices" and further seeks an order enjoining Harvard from "violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Massachusetts Equal Rights Act, and the Fair Housing Act." *Id.,* p. 35. These pleading deficiencies are all the more problematic given that the Complaint is not brought by any individual student seeking redress for something that purportedly happened to them, which at least would permit Harvard to respond based on information known about that student. Instead, the Complaint seeks through this litigation to force Harvard to change its policies—without identifying any specific provision.

Accordingly, the Complaint does not fairly put Harvard on notice of the claims against it, and if the Complaint is not dismissed in its entirety for the reasons stated above, then a more

definite statement must be ordered. *See Hayes v. McGee,* No. CIV.A. 10-40095-FDS, 2011 WL 39341, at *3 (D. Mass. Jan. 6, 2011) (ordering a more definite statement where portions of a complaint failed to "provide defendants with sufficient context or notice to enable them to frame a responsive pleading"); *Thompson v. Worcester Cnty.,* No. CIV. 10-40126-FDS, 2011 WL 2633270, at *3 (D. Mass. July 1, 2011) (requiring plaintiff "to submit an amended complaint that states the specific claims against each specific named defendant"); *Autila v. Massachusetts Bay Transportation Auth.,* 342 F.R.D. 23, 37 (D. Mass. 2022) (citing *Hilchey v. City of Haverhill,* 233 F.R.D. 67, 70 (D. Mass. 2005)) (requiring certain complaint paragraphs to be supplemented to indicate when alleged conduct took place).

## <u>CONCLUSION</u>

For the foregoing reasons, Harvard respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice or, in the alternative, order Plaintiff to submit an Amended Complaint containing, at a minimum, clear allegations that identify: (a) each Harvard policy, policies, or practice(s) alleged to be wrongful; (b) which statute(s) each of those policies or practices allegedly violate; (c) whether S4MHJ has current members who are currently or will be imminently subject to each purportedly unlawful practice; (d) the date(s) when any prior violation(s) purportedly occurred; and (e) the specific remedy sought.

Respectfully submitted,

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE**,
By its attorneys,

_____
Victoria L. Steinberg (BBO #666482)
Melanie Stallone (BBO #711658)
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111
617-481-0160
vsteinberg@clohertysteinberg.com
mstallone@clohertysteinberg.com

Dated: October 27, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ _Victoria L. Steinberg_____
Victoria L. Steinberg