UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Students 4 Mental Health Justice,<br><br>     Plaintiff,<br><br>v.<br><br>The President and Fellows of Harvard College,<br><br>     Defendant. | CIVIL ACTION NO.: 1:25-cv-11452<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I. <u>PRELIMINARY STATEMENT</u>

1. Harvard University ("Harvard"), the oldest university in the United States, systematically discriminates against its students with mental health disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182, *et seq.*; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794(a), *et seq.*; the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*; and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Students 4 Mental Health Justice ("S4MHJ") brings this action to remedy Harvard's systemic discrimination against its members, who include students with mental health disabilities attending Harvard.

2. Harvard is a highly selective university, ranking third among national universities and first in global rankings,[1] with tuition and associated fees of over $85,000 per year.[2] Despite

---

[1] U.S. News, 2025 Best National University Rankings, available at https://www.usnews.com/best-colleges/rankings/national-universities?_sort=rank&_sortDirection=asc 2024-2025 Best Global Universities Rankings, U.S. News, available at https://www.usnews.com/education/best-global-universities/rankings.
[2] Harvard FAS Registrar's Office, Harvard College Tuition Rates (Academic Year 2025-26), available at https://registrar.fas.harvard.edu/tuition-and-fees#hcol.

its elite status, Harvard's antiquated policies, practices, and procedures are rooted in stigma around mental health, and discriminate against students with mental health disabilities.

3.      In recent years, rates of reported mental health conditions have increased at higher education institutions across the country, including at Harvard.[3] Yet, Harvard responds to disability-related behavior with exclusion, blame, and draconian measures. Most significantly, Harvard systemically bans students from its campus who are experiencing mental health crises—or whom Harvard perceives to be experiencing such—thus depriving them of their community and supports during a particularly vulnerable time. Harvard then forces these students to undergo burdensome requirements to return, many of which are unrelated to their mental health recovery, in contrast with minimal requirements imposed on students who leave campus or take leaves of absence for non-mental health reasons. Harvard also requires students to sign coercive and onerous contracts that require students to give up their medical privacy and undergo mental health treatment under threat of expulsion. These contracts, which give Harvard the right to surveil students' private medical decisions and access private medical information in order to return to enrollment and campus, are applied routinely to students with a wide range of mental health conditions and are not tailored or individualized to the students' care needs. Because of Harvard's policies, current students report a chilling effect on seeking needed mental health supports for fear of being banned from campus and subjected to onerous requirements in order to

---

[3] Harvard University, Report of the Task Force on Managing Student Mental Health at 3 (June 2020), https://provost.harvard.edu/files/provost/files/report_of_the_task_force_on_managing_student_mental_health.pdf ("Our investigation confirmed that Harvard students are experiencing rising levels of depression and anxiety disorders, and high and widespread levels of anxiety, depression, loneliness, and other conditions"). *See also* The Harvard Crimson, University Task Force Finds Increase in Harvard Undergraduates Reporting Depression, Anxiety (July 2020), https://www.thecrimson.com/article/2020/7/25/harvard-mental-health-task-force/.

return.

4.      Harvard's policies, practices, and procedures illegally discriminate against students with mental health disabilities and must be ceased immediately.

## II.      JURISDICTION AND VENUE

5.      This is an action for declaratory and injunctive relief, brought pursuant to the ADA, 42 U.S.C. § 12182, *et seq.*; Section 504, 29 U.S.C. § 794, *et seq.*; the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*; and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for Plaintiff's claims arising under the ADA, Section 504, and the Fair Housing Act. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for claims arising under the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq.*

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391. A substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

## III.      PARTIES

8.      Plaintiff Students 4 Mental Health Justice ("S4MHJ") is a student-led membership advocacy group dedicated to building college campuses that are inclusive for students who are neurodivergent, mentally ill, and/or experience mental health crises. Many of S4MHJ's members are current Harvard students with mental health disabilities who have been directly harmed by Harvard's discriminatory policies and practices.

9.      Defendant the President and Fellows of Harvard College, originally chartered in 1650, is a Massachusetts corporation  and is Harvard's principal governing and policy-making body.

10.      Harvard University is a private university located in Cambridge, Massachusetts.

As a place of education, Harvard qualifies as a "public accommodation" under Title III of the ADA as that term is defined under 42 U.S.C. § 12181(7)(J). Harvard is also a recipient of federal financial assistance within the meaning of Section 504. Harvard's residence halls are covered "dwellings" under the Fair Housing Act, 42 U.S.C. § 3602(b), (c). Harvard operates programs and activities in the Commonwealth of Massachusetts and is subject to the Massachusetts Constitution.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiff Students 4 Mental Health Justice

11.    Plaintiff Students 4 Mental Health Justice ("S4MHJ") is a student-led group that advocates to build college campuses that are inclusive for students who are neurodivergent, mentally ill, and/or experience mental health crises.

12.    S4MHJ's mission is "to ensure all are included in higher education, by generating community-driven research, working in policy-making systems, and fostering solidarity among students forced underground by discriminatory policies."[4]

13.    S4MHJ's leadership includes a non-hierarchical board, composed of students who are empowered to make day-to-day decisions on behalf of its members, including drafting policy memoranda, research plans, and recruitment strategies.

14.    S4MHJ members voluntarily join, support its mission, and are represented by S4MHJ and its board in good faith.

15.    Presently, S4MHJ has a membership of approximately 30, most of whom are current Harvard students who are neurodivergent and/or have mental health disabilities, and thus

---

[4] Students 4 Mental Health Justice Organizational Roadmap at 2, available at https://docs.google.com/document/d/1r3H_Ko1VoWDYkbG6ePnXRgDPdVGKlWl8ekL4w5XCo4E/edit?tab=t.0.

are students who have been directly harmed by Harvard's discriminatory policies, practices, and procedures, and continue to be subject to them.

16.     For many S4MHJ members, their mental health conditions substantially limit one or more major life activities, including sleeping, eating, learning, thinking, concentrating, and living, and/or major bodily functions, including brain, neurological, or cognitive functions.

17.     S4MHJ's projects include researching mental health policies at Massachusetts universities, including forced leave of absence policies, and advocating for state legislation protecting higher education students with mental health disabilities.

18.     S4MHJ brings this suit on behalf of its members in the Harvard community with mental health disabilities to eliminate discriminatory policies and practices and protect their members and others from current and future discrimination.

19.     Harvard's discriminatory policies and practices exclude S4MHJ members and will continue to exclude S4MHJ members from the College's programs and services—including its campus and facilities—because of their disabilities.

20.     Harvard's discriminatory policies and practices deter, and will continue to deter, S4MHJ members from fully participating in Harvard's programs and services, including its mental health counseling services, out of fear that Harvard will exclude them from student life because of their disability.

21.     The experiences of five S4MHJ members, Students A, B, C, D, and E, demonstrate the ways in which Harvard's discriminatory policies and practices harm students with mental health disabilities.

**B.    <u>Student A</u>**

22.     For example, one current S4MHJ member ("Student A"), a Harvard student with a diagnosed mental health disability, was placed on a semester-long leave of absence as a result

5

of a mental health-related hospitalization in December 2022. Because Harvard did not permit Student A back on campus after her hospitalization, even to finish final exams, she risked being forced into an academic withdrawal. An academic withdrawal would have put her degree in jeopardy. Given the limited choice between being forced into academic withdrawal or taking a medical leave of absence for the rest of the term and entire next semester, Student A chose the latter.

23.    However, despite agreeing to take a leave of absence, Harvard did not lift Student A's campus ban—even to retrieve her clothing and personal items from her student housing. Because Harvard banned her from campus, Student A had to borrow hospital clothing, and her parents had to travel to Harvard from Georgia to remove her belongings from her on-campus housing. Student A was not allowed to assist her parents or even enter areas of Harvard where members of the general public are allowed.

24.    After Student A's leave formally began, she received a letter from Harvard informing her that she would have to petition Harvard's Administrative Board to return, including demonstrating compliance with Harvard's reinstatement requirements as memorialized in a document called the "HUHS Rider." These reinstatement requirements included six months of continuous, full-time work that had to be verified by a letter from her supervisor;[5] six months of active participation in mental health treatment and detailed letters from her healthcare providers about that treatment and her progress; the names and contact information of her healthcare providers; HIPAA releases for Harvard to speak with her healthcare providers; and a personal statement.

---

[5] Student A's resident dean also contacted her supervisor regarding the letter before submitting it to the Administrative Board for review.

25.     The letter also explained that Student A's Harvard student health insurance would terminate while she was on leave. Because Harvard terminated her health insurance but still required her to immediately engage in mental health treatment in order to return to school, Student A and her family had to take on burdensome out-of-pocket costs for mental health care.

26.     Student A ultimately fulfilled each of Harvard's requirements to return and was permitted to return in the Fall of 2023. When Student A returned, Harvard staff at the Counseling and Mental Health Service ("CAMHS") requested the names of Student A's mental health treatment providers.

27.     Harvard's policies and practices have chilled Student A from seeking on-campus mental health treatment. In order to preserve her medical privacy, Student A is receiving off-campus mental health treatment. She is deterred from using on-campus mental health treatment providers because those on-campus providers report to Harvard Administrators and she remains subject to Harvard's discriminatory policies.

**C.     <u>Student B</u>**

28.     Another S4MHJ member ("Student B") is a student at Harvard with a mental health disability. Harvard banned Student B from entering the Harvard University campus after she was taken to the Emergency Room at McLean Hospital for mental health reasons towards the end of her freshman Fall semester in 2022. While she was in the hospital, Student B's Resident Dean told her that she was not cleared to return to her residence or for enrollment.[6] Student B repeatedly asked her Resident Dean to tell her what steps she needed to take in order to return to campus, but her Resident Dean deflected and would not provide her with any details on how to

---

[6] Student B's hospital discharge summary identified her as being "placed on involuntary medical leave after recent incident."

return, instead they told Student B to focus on her recovery instead, or words to that effect.

29.    Because Harvard had banned Student B from returning to her housing or continuing her enrollment, she could not complete her coursework. Harvard also prohibited Student B from accessing her dorm room—her only housing in Massachusetts—and did not allow Student B (whether escorted or not) to gather any personal belongings, clothing, or even her toothbrush from her room. Consequently, Student B's father had to fly from Virginia to Massachusetts to pack up her dorm room with Student B's Resident Dean.

30.    Because the only instruction Harvard provided to her was that she needed to focus on her recovery before she could return to Harvard, Student B engaged in a residential treatment program, where she remained for over a month. Eager to return to Harvard for the Spring 2023 semester so as not to disrupt her academic career any further, Student B asked multiple times for an explanation of what she needed to do to re-enroll and return to campus. The Spring 2023 semester began on January 24, 2023; however, Harvard did not give Student B any instructions about how to return to Harvard until January 6, 2023.

31.    Harvard instructed Student B that she would have to petition to return. Student B's Resident Dean told Student B that, as part of the petition process, she would need to write a personal statement explaining why she "might be ready to return" and what her "support structure" on campus would be. The Resident Dean also told her that she must also be interviewed by CAMHS. Harvard required Student B to provide CAMHS and Harvard with a HIPAA release of medical information in order for CAMHS to speak to her treatment providers. She was told that CAMHS would then submit a letter to Harvard's Administrative Board[7] summarizing its conversations with Student B and Student B's treatment providers.

_____

[7] The Administrative Board decides all student petitions to return to Harvard.

32.     Student B was allowed to return to Harvard on January 25, 2023—a day after the

semester began. However, as a condition of returning, Harvard required Student B to sign a

contract to engage in treatment ("treatment contract") and informed her that she would have to

re-sign the same treatment contract every academic year until graduation. Since that initial

contract, Harvard has required her to sign treatment contracts with nearly identical conditions on

August 29, 2023, August 19, 2024, and, most recently, on July 15, 2025. The latest treatment

contract, like Student B's three previous treatment contracts, has no end date, and currently

requires Student B to follow the recommendations of her treatment team, regularly attend and

"actively participate[]" in appointments with her treatment team, remain on prescribed

medications, refrain from using illicit substances, consume alcohol in "moderation," bring

"clinical concerns" to her treatment team instead of friends and peers, and "immediately" submit

to psychological evaluation when required by Harvard administrators, among other requirements.

The contract also requires Student B to surrender her medical privacy rights and allow Harvard

to directly contact her treating medical providers, and states that failure to comply with any of its

terms could result in dismissal from Harvard. *See* Harvard College Student Handbook 2024-25,

at 43; Harvard College Student Handbook 2025-26, at 44 (providing that failure to adhere to the

terms of an agreement to engage in treatment could result in an involuntary leave of absence).

33.     Student B is subject to Harvard's discriminatory policies and, because of the

treatment contract, is at risk of being placed on involuntary leave or permanently dismissed from

Harvard if Harvard deems her to have violated her treatment contract in any way.

**D.     <u>Student C</u>**

34.     A third S4MHJ member ("Student C"), now graduated, attended Harvard as a

student with a diagnosed mental health disability. During her tenure, Harvard banned Student C

from campus twice and required that she sign a treatment contract nearly every semester of her

9

college career.

35.    Student C was first hospitalized in September 2021, the fall of her freshman year.

36.    As a condition of returning to campus post-hospitalization, Harvard required Student C to sign a treatment contract. Student C signed the contract on October 31, 2021 and was informed that she would have to re-sign the same treatment contract every academic year until graduation and that its terms were nonnegotiable. Student C was not provided with a copy of the Fall 2021 contract.

37.    Harvard required Student C to re-sign a treatment contract before her Fall 2022 semester. She was not provided with a copy of this treatment contract.

38.    Harvard required Student C to again sign a treatment contract on August 28, 2023. Harvard provided Student C with a copy of this contract, which required Student C to follow the recommendations of her treatment team, regularly attend and "actively participate[]" in appointments with her treatment team, remain on prescribed medications, "remain sober at all times," "abstain entirely from the consumption of alcohol," bring "clinical concerns" to her treatment team instead of friends and peers, and "immediately" submit to psychological evaluation when required by Harvard administrators, among other requirements. The contract also required Student C to surrender her medical privacy rights and allow Harvard to directly contact her treating medical providers, and stated that failure to comply with any of its terms could result in dismissal from Harvard.

39.    Harvard required Student C to re-sign treatment contracts in February 21, 2024, and again on September 10, 2024.

40.    Twice during her tenure, Harvard banned Student C from campus. Harvard first banned Student C from campus while Student C hospitalized at McLean Hospital in December

2024. Harvard informed Student C that she was not allowed to return to her dorm or step foot on any property owned by Harvard—including public property—even for a day, or to retrieve her personal belongings. When student C informed Harvard that she did not have any clothes and expressed discomfort with people entering her dorm room in her absence, Harvard still barred her from returning to gather her belongings. Instead, Harvard instructed Student C that she could have someone else retrieve what she needed or that a resident tutor could pack up her things for her.

41.     To return to enrollment and housing, Harvard required Student C to petition the Administrative Board. As part of the petition to return process, Student C had to write a personal statement, release treatment records from her inpatient and outpatient mental health providers, and undergo an evaluation by CAMHS.

42.     While the Administrative Board granted Student C's petition to return, Student C's readmission was conditioned on her compliance with the treatment contract she had signed before her hospitalization. Student C's Resident Dean told her that she must continue taking medication and working with her outpatient mental health treatment providers, and warned her that she must "take her distress" only to the Dean and Student C's treatment team, not her peers.

43.     In the years following Student C's first hospitalization, Student C was subject to invasive surveillance from her Resident Dean and the two resident tutors in her dorm: Student C's Resident Deans required regular check-ins with Student C, and called Student C's mental health provider to inquire whether Student C had spoken about her psychiatric medication with the provider. After Student C's second hospitalization, a graduate student proctor for her residence—similar to a resident advisor at other universities—twice entered Student C's dorm room without permission, and even flipped over Student C's blanket while Student C lay in bed

when Student C did not come down to a group dinner.

44.    The Administrative Board placed Student C under a second campus ban on May 6, 2025, after a hospitalization. During this ban, she was only permitted to go on campus to go to the library to finish her coursework and take one final exam.

45.    The Administrative Board's decision placed restrictions on Student C's commencement participation. Harvard only allowed Student C to participate in commencement activities under conditions not imposed on other graduating students, including the requirement that Student C's parents be present and share their contact information with Harvard. As such, Student C was deprived of access to nearly all Harvard's programs and services besides basic academic programs.

### E.    Student D

46.    Another S4MHJ member ("Student D"), now graduated, attended Harvard as a student with a mental health disability. Harvard's policies and practices chilled Student D from seeking mental health treatment. Student D was deterred from seeking on-campus mental health treatment for suicidal ideation because she feared that she would be placed on a leave of absence. She ultimately sought treatment off campus due to these fears.

47.    Student D only started speaking candidly with her mental health treatment provider about suicidal ideation and self-harm once she was assured by her treatment provider that her medical or treatment information would not be shared with Harvard. Still, when Student D's treatment provider recommended that she seek psychiatric care on campus, Student D was deterred from doing so due to her continued fears of triggering a campus ban or an involuntary leave of absence.

### F.    Student E

48.    S4HMJ member ("Student E"), another Harvard student with a mental health

disability, was forced to remain hospitalized not because he needed further treatment but because Harvard refused to allow him back to Harvard's campus after thoughts of self-harm caused him to go to the Emergency Room in the Fall 2023 semester.

49.     Although Student E's treatment providers at McLean Hospital determined that he could be discharged by or around Wednesday, October 4, 2023, and preferred to discharge him at that time, a Harvard representative told McLean Hospital personnel that Harvard preferred that Student E be discharged on Tuesday, October 10, 2023, even though McLean Hospital personnel believed an extended stay "would not be therapeutic."

50.     After extensive advocacy by Student E and his McLean provider during calls with representatives from Harvard on October 4, 2023, Harvard finally informed Student E that he was cleared to continue enrollment and return to on-campus housing on October 5, 2023, under the conditions that he and his McLean provider meet with CAMHS, and that he sign a treatment contract, and that he would have to re-sign the same treatment contract every academic year until graduation. Since that initial contract, Harvard has required him to sign treatment contracts with nearly identical conditions on February 22, 2024, September 10, 2024, and, most recently, on September 18, 2025.

51.     The most recent treatment contract, like Student E's three previous treatment contracts, has no end date, and currently requires Student E to follow the recommendations of his treatment team, regularly attend and "actively participate[]" in appointments with his treatment team, remain on prescribed medications, bring "clinical concerns" to his treatment team instead of friends and peers, and "immediately" submit to psychological evaluation when required by Harvard administrators, among other requirements. The contract also requires Student E to surrender his medical privacy rights and allow Harvard to directly contact his treating medical

providers, and states that failure to comply with any of its terms could result in dismissal from Harvard. *See* Harvard College Student Handbook 2024-25, at 43; Harvard College Student Handbook 2025-26, at 44 (providing that failure to adhere to the terms of an agreement to engage in treatment could result in an involuntary leave of absence).

52.    Because of these treatment contracts, Student E has been and continues to be subject to surveillance by Harvard personnel. For example, in November 2024, Student E's Resident Dean contacted Student E about a missed psychiatric appointment and directed him to reschedule the missed appointment immediately. Because Student E's psychiatrist only had available appointments during Student E's class times, Student E had to miss a class in order to make up the missed appointment.

53.    In August 2025, Student E's Resident Dean informed Student E that he would not be able to move back to campus until he signed another treatment contract, even though Student E's previously signed treatment contract was still in effect. In September 2025, Student E's Resident Dean directed Student E to give a psychiatric appointment "highest priority" in his schedule, seemingly over academic obligations, and then gave Student E an arbitrary and unrealistic three week deadline to identify a new therapist, even though Student E's treating providers did not think it was necessary or clinically indicated for him to continue therapy. Despite this deadline, Harvard required Student E to sign a treatment contract without a therapist listed. Conflicting instructions have left Student E confused as to whether Harvard still expects him to secure a therapist.

54.    Student E is at risk of being placed on involuntary leave or permanently dismissed from Harvard if he is deemed to have violated his treatment contract in any way, including by missing additional appointments due to competing academic obligations.

## V.    HARVARD'S DISCRIMINATORY POLICIES AND PRACTICES

55.    S4MHJ members Students A, B, C, D, and E were all subjected to Harvard's discriminatory policies and practices. Students A, B, and E and other S4MHJ members currently enrolled at Harvard, and all other Harvard students with mental health disabilities, continue to be subject to Harvard's discriminatory policies and consequently harmed by Harvard's policies, practices, and procedures as described below.

### A.    Harvard Denies Students with Mental Health Disabilities Equal Access by Excluding Them from Campus and Housing.

56.    Students who go to the hospital or emergency room for mental health related reasons are automatically banned from campus until Harvard clears them to return, regardless of whether their treating medical providers have discharged them from the hospital or emergency room. Harvard policy, as outlined in the Harvard Student Handbook, bans students for several disability-related reasons, including students who are "not cleared to return to enrollment and/or residence at Harvard College following . . . a hospitalization or emergency room visit that raises serious concerns about the student's health or well-being."[8] Harvard policy maintains that "[a]fter a hospitalization or emergency room visit . . . Harvard College ordinarily will not permit that student to return to residence and enrollment or participation in any Harvard-related programs or activities before making its own assessment of the suitability of the student's return."[9] In practice, these policies are only applied to students who are hospitalized or visit the emergency room for symptoms of mental health disabilities, and not to students who are hospitalized or visit the emergency room for other reasons, such as a broken arm.

---

[8] Harvard College Student Handbook 2024-25 at 43; Harvard College Student Handbook 2025-26 at 44.
[9] Harvard College Student Handbook 2024-25 at 87; Harvard College Student Handbook 2025-26 at 90.

57.     Harvard automatically bans students with mental health disabilities from returning to campus or their housing even if the student's treating medical provider does not think the student requires inpatient treatment or poses a threat of harm to themselves or anyone else. By banning students who have been hospitalized or visited the emergency room for mental health disability related reasons from returning to enrollment and/or residence at Harvard, or from participating in any Harvard-related programs or activities, while allowing students who have been hospitalized for non-mental health related reasons to return to enrollment and residence, Harvard discriminates against people with disabilities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

58.     Under Harvard's policy, these students are unable to step foot on Harvard College or University property, which means they have no housing, cannot return to on-campus employment, cannot participate in student activities, cannot use campus libraries—even to finish makeup exams or assignments—and cannot attend classes without "prior, express permission."[10] As a result, these students lose access to housing, support networks, and their personal belongings (including wallets, personal documents, clothing, and personal hygiene items) during an extremely vulnerable time. They become relegated to a status that is even more restricted than members of the general public—about whom Harvard knows nothing—who are generally free to enter Harvard's campus. By banning students who have been hospitalized or visited the emergency room for mental health disability related reasons from Harvard College or University property, while allowing students who have been hospitalized for non-mental health reasons to be on Harvard property, Harvard discriminates against people with disabilities in violation of 42

---

[10] Harvard College Student Handbook 2024-25 at 45; Harvard College Student Handbook 2025-26 at 46.

U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

59.     Similarly, students placed on involuntary leave who have been hospitalized or admitted to the emergency room for mental health reasons are expected to vacate university property "as soon as possible and no later than five business days after" the decision to exclude them from campus.[11] This means they are required to remove all of their property from their Harvard housing, which is a difficult and expensive task as these students are not allowed on campus to collect and remove their belongings themselves. This policy typically results in students' families bearing the expense to quickly travel to campus in order to collect and remove their children's belongings for them. By requiring students who have been hospitalized or admitted to the emergency room for mental health reasons to vacate university property, while allowing students who have been hospitalized for non-mental health reasons to continue residing on university property, Harvard discriminates against people with disabilities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

60.     Harvard policy also requires that students who have been hospitalized or visited the emergency room for mental health disability related reasons, or who exhibit symptoms related to a mental health disability, sign "agreements to engage in treatment," or treatment contracts, as a condition to return to campus.[12] Students subject to treatment contracts may be excluded from campus again or even permanently dismissed from Harvard for failure to adhere to the terms of such contracts.[13] By requiring students with mental health disabilities, but not

---

[11] Harvard College Student Handbook 2024-25 at 44; Harvard College Student Handbook 2025-26 at 45.

[12] Harvard College Student Handbook 2024-25 at 48, 87–8; Harvard College Student Handbook 2025-26 at 47, 49.

[13] Harvard College Student Handbook 2024-25 at 43; Harvard College Student Handbook 2025-26 at 44.

other students, to sign treatment contracts, Harvard discriminates against people with disabilities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

**B.    <u>Harvard Imposes Discriminatory Criteria on Students Seeking to Return to Campus.</u>**

61.    Harvard imposes additional standards and criteria on students with mental health disabilities seeking to return to campus and housing after mental health leaves of absence or inpatient mental health treatment that it does not impose on students returning from leaves of absence for non-mental health reasons.

**1.    Students Returning From Mental Health Leaves of Absence Face Additional Barriers and Must Satisfy Arbitrary Requirements to Return.**

62.    In order to return to campus following inpatient mental health treatment or a mental health related leave of absence, Harvard requires students with mental health disabilities to petition Harvard's Administrative Board to return.[14] For students seeking to return from a mental health leave of absence, this requirement is set out in the Harvard University Health Services rider (hereinafter "HUHS Rider").

63.    Students petitioning to return from a mental health leave of absence must demonstrate evidence of stability and productivity, "readiness to return," and show that "the circumstances that led to their leave have been satisfactorily addressed."[15] To demonstrate evidence of productivity, the Harvard College Student Handbook encourages students to demonstrate "a substantial period of regular employment at a non-academic job and a suitable

---

[14] Harvard College Student Handbook 2024-25 at 46–47; Harvard College Student Handbook 2025-26 at 47.

[15] Harvard College Student Handbook 2024-25 at 46; Harvard College Student Handbook 2025-26 at 47.

letter of recommendation from the employer, employment, or volunteer supervisor."[16] Harvard also requires students petitioning to return to "consult" with Harvard University Health Services and "grant permission to Harvard University Health Services to obtain their relevant treatment records and communicate with their treatment providers."[17] The HUHS Rider requires students to document participation and progress in medical treatment "for a period of ordinarily not less than six consecutive months" and "engage in six or more months of employment at a non-academic job, and to provide a letter of recommendation from their supervisor."[18] The Harvard College Student Handbook does not otherwise explain how to demonstrate "readiness to return" or the reasons that Harvard may deny a student's petition to return.[19]

64.      In contrast, students in good standing who seek to return from a non-mental health leave of absence may ordinarily return simply by notifying their Resident Dean twelve weeks in advance of any term.[20]

65.      By imposing such invasive and burdensome requirements on students with mental health disabilities seeking to return to Harvard following inpatient mental health treatment or a

---

[16] *Id.*

[17] *Id.*

[18] Harvard HUHS Rider, at 1. The HUHS Rider's checklist includes work and treatment requirements; meetings with Harvard administrators; a personal statement describing how the student spent their time away; and letters from employers and healthcare providers, including a detailed letter from their healthcare provider that includes the provider's contact information, information concerning the student's initial presentation, present treatment regime, medication regimen, compliance with treatment, and readiness to return. Harvard also requires students to waive privacy with their healthcare provider and sign HIPAA authorizations for HUHS to obtain information directly from their treatment providers and then share that information with the dean or academic office evaluating the petition for return.

[19] Harvard College Student Handbook 2024-25 at 42, 46–8; Harvard College Student Handbook 2025-26 at 43, 47–9.

[20] Harvard College Student Handbook 2024-25 at 71; Harvard College Student Handbook 2025-26 at 47.

mental health related leave of absence, while not imposing such requirements on students

seeking to return to Harvard following periods of absence for non-mental health reasons,

Harvard discriminates against people with disabilities in violation of 42 U.S.C. § 12182, 29

U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

**2.    Students Returning From Mental Health Inpatient Treatment or Hospitalization Must Sign Treatment Contracts.**

66.    When readmitting a student following a leave of absence or hospitalization, and

when Harvard believes that a student's "conduct or circumstances have caused heightened

concerns" about the student's "safety and/or well-being," "the appropriateness of the student's

continued enrollment and/or residence," or "the student's readiness to return to the Harvard

community," Harvard often makes that student's enrollment and/or residence "conditional . . . on

certain terms of conditions[] as set forth in a written agreement "to engage in treatment."[21] In

practice, this policy only applies to students with mental health disabilities who have been

hospitalized or visited the emergency room for mental health disability related reasons, or who

exhibit symptoms related to a mental health disability. Students subject to agreements to engage

in treatment, or treatment contracts, may be excluded from campus again or even permanently

dismissed from Harvard for failure to adhere to the terms of such contracts, even when

compliance conflicts with students' academic obligations.[22] By requiring students with mental

health disabilities, but not other students, to sign treatment contracts, Harvard discriminates

against people with disabilities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93

§ 103, and 42 U.S.C. § 3601.

---

[21] Harvard College Student Handbook 2024-25 at 48; Harvard College Student Handbook 2025-26 at 47, 49.

[22] Harvard College Student Handbook 2024-25 at 43; Harvard College Student Handbook 2025-26, at 44.

67.     Treatment contracts often include "compliance with a medical treatment plan, regular consultations with health care professionals, communication with administrators, and limited disclosure of relevant medical information, on a need-to-know basis, such as compliance with treatment and restrictions on certain activities."[23] Although Harvard asserts that these treatment contracts are individualized, many students, including Students B, C, and E, have been compelled to sign materially identical treatment contracts throughout the duration of their enrollment at Harvard, indicating that there is no individualized analysis based on students' particular or changed circumstances and that Harvard instead imposes blanket requirements based on stereotypes and generalizations about people with mental health disabilities. No other students at Harvard are subject to expulsion for failing to attend a single therapy or psychiatry appointment, or failing to pick up psychiatric medication. By imposing such burdensome requirements on students with mental health disabilities but not other students, Harvard discriminates against people with disabilities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, M.G.L. c. 93 § 103, and 42 U.S.C. § 3601.

### C.     Harvard Interferes with Students' Access to Mental Health Services on the Basis of Disability.

68.     As a result of Harvard's policies, practices, and procedures described *supra*, students with mental health disabilities are caught in a double bind: either stay away from on-campus mental health services and risk a mental health crisis, or utilize these services and risk being excluded from campus.[24]

---

[23] Harvard College Student Handbook 2024-25 at 48, 87; Harvard College Student Handbook 2025-26 at 49.

[24] *See* Swathi Kella, *The Imperfect Storm: College Students and Suicide*, Harvard Political Review (Aug. 10, 2021), available at https://harvardpolitics.com/the-imperfect-storm/ ("These policies have had a chilling effect on students seeking mental health care, deterring them from

69.    An official Harvard Task Force reported in 2020 that "[l]eaves of absence seem to be a source of fear and anxiety for some students," and that "students cited the possibility of being put on an involuntary leave as a reason not to seek help" or to be "hesitant[] to disclose their mental health challenges to Harvard-employed counselors and others in the administration, fearing the possibility that they would be asked to leave."[25]

70.    Harvard's policies concerning exclusion from campus, readmittance, and treatment contracts have deterred S4MHJ members, including Students A, B, and E, from seeking free on-campus mental health services for fear of being placed on leave of absence and getting excluded from campus. By deterring students with mental health disabilities from seeking free on-campus mental health services, Harvard discriminates against students with disabilities and denies these students an equal opportunity to participate in and benefit from its programs, services, and activities in violation of 42 U.S.C. § 12182, 29 U.S.C. § 794, and M.G.L. c. 93 § 103.

## VI.    S4MHJ MEMBERS AND OTHER HARVARD STUDENTS WITH MENTAL HEALTH DISABILITIES ARE SUBJECT TO HARVARD'S DISCRIMINATORY POLICIES AND PRACTICES.

71.    A 2020 report issued by Harvard noted that between "2014 and 2018, the percentage of Harvard undergraduates reporting that they have or think they may have depression increased from 22% to 31%, and the percentage reporting that they have or think they

---

obtaining help for fear of being placed on mandatory leave. 'It was either like I didn't get help, or I did get help, and it would have just cost me a medical leave,' shared [a student].").

[25] Harvard University, Report of the Task Force on Managing Student Mental Health (July 2020), *supra* note 3, at 14; *see also* Sellers Hill & Nia Orakwue, *At Harvard College, New Mental Health Resources Face Familiar Challenges*, The Harvard Crimson (Oct. 6, 2023), available at https://www.thecrimson.com/article/2023/10/6/mental-health-feature-harvard/#:~:text=The%20Harvard%20Crimson-,At%20Harvard%20College%2C%20New%20Mental%20Health%20Resources%20Face%20Familiar%20Challenges,understanding%20of%20these%20resources%20persist.

may have an anxiety disorder increased from 19% to 30%."[26] Harvard graduate students also reported high rates of mental health conditions, with "almost a quarter of respondents exhibit[ing] symptoms of moderate to severe depression at the time of the survey, with a similar rate for moderate to severe generalized anxiety."[27] Applying these percentages to current admission numbers, Plaintiff estimates that over 2,000 undergraduates and over 4,000 graduate students may have qualifying mental health disabilities. These statistics likely undercount the total number since they only account for two mental health conditions—depression and anxiety disorder. Moreover, it is likely that some students did not report experiencing depression or anxiety—or respond to the survey at all—due to the stigmatization of these and other mental health disabilities.

72.    According to the American College Health Association, in 2024, twenty-one percent of college students reported having serious psychological distress. Thirty-five percent of college students were diagnosed with anxiety, and twenty-five percent had been diagnosed with depression.[28] Recent studies of college students indicate record numbers of students dealing with depression, anxiety, eating disorders, and other mental health disabilities. For example, in 2017, the National Council on Disability reported that thirty-five percent of students met the criteria for at least one mental health disorder.[29] More recently, in 2023, a Healthy Minds Survey found that

---

[26] Harvard University, Report of the Task Force on Managing Student Mental Health (July 2020), *supra* note 3, at 4.

[27] *Id.*

[28] American College Health Association, *National College Health Assessment: Undergraduate Student Reference Group Data Report* (Fall 2024), at 64-65, 115, available at https://www.acha.org/wp-content/uploads/NCHA-IIIb_FALL_2024_UNDERGRADUATE_REFERENCE_GROUP_DATA_REPORT.pdf

[29] National Council on Disability, *Mental Health on College Campuses: Investments, Accommodations Needed to Address Student Needs* (Jul. 21, 2017), available at https://www.ncd.gov/assets/uploads/reports/2017/ncd_mental_health_college_campuses.pdf.

forty-four percent of students across campuses reported symptoms of depression.[30] These were considered some of the highest rates in the survey's fifteen-year history.[31]

## **FIRST CAUSE OF ACTION**

### **Violations of Title III of the Americans with Disabilities Act**

### **42 U.S.C. § 12182, *et seq.***

73.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of this Complaint.

74.     Title III of the Americans with Disabilities Act ("ADA") and its implementing regulations entitle individuals with disabilities to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

75.     At all times relevant to this action, impacted members of Plaintiff S4MHJ were Harvard students with mental health disabilities, and thus are qualified individuals with disabilities within the meaning of the ADA, because each student has, has a record of having, or has been regarded as having "a physical or mental impairment that substantially limits one or more major life activities" such as sleeping, eating, learning, thinking,  concentrating, and living, or a major bodily function, such as brain, neurological, or cognitive functions. 42 U.S.C. § 12102(1). Current members of Plaintiff S4MHJ who are Harvard students are otherwise qualified to participate in Harvard services, programs, and activities.

---

[30] Daniel Eisenberg et al., *The Healthy Minds Study 2021-2022 Data Report* (2023), available at https://healthymindsnetwork.org/wp-content/uploads/2023/08/HMS-National-Report-2021-22_full.pdf.

[31] Univ. of Michigan School of Public Health, *College Students' Anxiety, Depression Higher Than Ever, but So Are Efforts to Receive Care* (Mar. 9, 2023), available at https://sph.umich.edu/news/2023posts/college-students-anxiety-depression-higher-than-ever-but-so-are-efforts-to-receive-care.html.

76.     At all times relevant to this action, Harvard, as an undergraduate or postgraduate school, or other place of education, has been and is a "place of public accommodation" within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(J).

77.     Title III prohibits public accommodations from denying opportunities, or affording unequal opportunities, to an individual with a disability or class of individuals with disabilities to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity on the basis of disability, and from otherwise discriminating against such individuals on the basis of disability. 42 U.S.C. § 12182(b)(1)(A)(i)–(ii); 28 C.F.R. § 36.202(a)–(b).

78.     Title III prohibits public accommodations from failing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

79.     Title III prohibits public accommodations from denying individuals with disabilities the opportunity to participate in the same programs or activities as non-disabled individuals. 42 U.S.C. § 12182(b)(1)(C); 28 C.F.R. § 36.202(a–c).

80.     Title III prohibits public accommodations from utilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, 42 U.S.C. § 12182(b)(1)(D); 28 C.F.R. § 36.204, and from imposing or applying eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered, 42 U.S.C. § 12182(b)(2))(A)(i); 28 C.F.R. § 36.301(a).

81.    By immediately banning students with mental health disabilities from campus, including student housing, upon hospitalization or emergency room admission, Harvard has violated Title III of the ADA by denying Harvard student members of Plaintiff S4MHJ, as persons with disabilities, the opportunity to fully and equally enjoy, participate in, and benefit from Harvard's goods, services, facilities, privileges, advantages, and accommodations, on the basis of disability, as well as the opportunity to participate in the same programs and activities as non-disabled Harvard students. 42 U.S.C. § 12182(a); 42 U.S.C. § 12182(b)(1)(C); 28 C.F.R. § 36.201(a); 28 C.F.R. § 36.202(a).

82.    By immediately banning students with mental health disabilities from campus, including student housing, upon hospitalization or emergency room admission, without regard for individualized circumstances, and by imposing nearly identical treatment contracts and readmission requirements on students with mental health disabilities, Harvard has violated Title III of the ADA by failing to make reasonable modifications to its policies and practices to ensure that Harvard student members of S4MHJ, as persons with disabilities, have equal access to the benefits of Harvard's goods, services, facilities, privileges, advantages, and accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

83.    By requiring students with mental health disabilities to fulfill onerous and burdensome requirements to regain access to campus, whether through compliance with treatment contracts, the process of receiving "clearance" to return after receiving medical treatment, or through the petition to return process following a leave of absence, Harvard has violated Title III of the ADA by utilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, and by imposing or applying eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and

equally enjoying goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(1)(C); 42 U.S.C. § 12182(b)(2))(A)(i); 28 C.F.R. § 36.204; 28 C.F.R. § 36.301(a).

84.     As a proximate result of Harvard's violations of the ADA, Plaintiff's Harvard student members with disabilities have been injured as set forth herein.

85.     Harvard's conduct has violated and continues to violate the ADA, and unless restrained from doing so, Harvard will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries for which Harvard student members of Plaintiff S4MHJ have no other adequate remedy at law. Consequently, Plaintiff is entitled to injunctive relief pursuant to section 308 of the ADA, 42 U.S.C. § 12188(a), as well as reasonable attorneys' fees and costs, 42 U.S.C. § 12205.

86.     WHEREFORE, Plaintiff requests relief as set forth below.

## SECOND CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act of 1973

### 29 U.S.C. § 794, *et seq.*

87.     Plaintiff re-alleges and incorporates herein all previously alleged paragraphs of this Complaint.

88.     Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that otherwise qualified individuals with disabilities shall not, solely by reason of their disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a); 34 C.F.R. § 104.4(a).

89.     As individuals with mental health disabilities, impacted members of Plaintiff

S4MHJ are persons with disabilities within the meaning of Section 504, because each has, has a record of having, or has been regarded as having a "physical or mental impairment that substantially limits one or more major life activities" such as sleeping, eating, learning, thinking, concentrating, and living. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20) (citing 42 U.S.C. § 12102). Current members of Plaintiff S4MHJ who are Harvard students are otherwise qualified to participate in Harvard services, programs, and activities. 34 C.F.R. § 104.3(l)(3).

90.    As a university and recipient of Federal funds, Harvard's operations are qualified programs or activities within the meaning of Section 504. 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. §§ 104.3(k)(2)(i), 104.41. Furthermore, as an educational institution which permits students to pay education-related costs with the assistance of Federal grants and loans and has done so at all times relevant to the claims asserted in this Complaint, Harvard is a recipient of Federal financial assistance sufficient to invoke Section 504 coverage. 34 C.F.R. § 104.3(h).

91.    Section 504 implementing regulations promulgated by the U.S. Department of Education ("DOE regulations") further provide that recipients of Federal financial assistance, in providing any aid, benefit, or service, may not, on the basis of disability, discriminate against an otherwise qualified person with a disability by providing them with an opportunity to participate in or benefit from an aid, benefit, or service that is different, separate, not equal, or not as effective as that which is afforded others. 34 C.F.R. §§ 104.4(b)(1)(i)–(iv).

92.    DOE regulations prohibit recipients of Federal financial assistance from limiting a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving any aid, benefit, or service. 34 C.F.R. § 104.4(b)(1)(vii).

93.    DOE regulations provide that no qualified student with a disability shall, on the basis of disability, be excluded from participation in, denied the benefits of, or otherwise

subjected to discrimination under any academic, research, housing, health insurance, counseling, financial aid, athletics, recreation, other extracurricular, or other postsecondary education aid, benefits, or services. 34 C.F.R. § 104.43(a); *see also* 34 C.F.R. §§ 104.43(c), 104.52(a)(1).

94.    DOE regulations require recipients of Federal financial assistance to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability, including such modifications to academic requirements as are necessary to ensure that the requirements do not discriminate or have the effect of discriminating against a qualified student with a disability on the basis of disability. 34 C.F.R. §§ 104.12, 104.44(a).

95.    DOE regulations prohibit recipients of Federal financial assistance from utilizing standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, 34 C.F.R. § 104.4(b)(4), which includes imposing admission criteria that has a disproportionate, adverse effect on students with mental health disabilities. 34 C.F.R. § 104.42(b)(2).

96.    Harvard has violated Section 504 by denying Harvard student members of S4MHJ the benefits of their programs, services, and activities on the basis of disability.

97.    Harvard has violated Section 504 by failing to make reasonable accommodations to the known mental health disabilities of its otherwise qualified students, including to its policies addressing campus exclusion and return to campus following mental health-related inpatient treatment or hospitalization.

98.    Harvard has violated Section 504 by imposing standards and criteria of administration, through its policies, including its readmission criteria, on student members of S4MHJ that has the effect of discriminating against them and other students with mental health

disabilities by tending to screen them out of maintaining student status and access to campus and its resources, including education and coursework, housing, and other programs, services and activities on the basis of disability.

99.    As a proximate result of Harvard's violations of Section 504, Harvard student members of Plaintiff S4MHJ have been injured as set forth herein.

100.    Because Harvard's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to 29 U.S.C. § 794a.

101.    Plaintiff and its members have no adequate remedy at law and unless the relief requested herein is granted, Harvard student members of S4MHJ will suffer irreparable harm in that they will continue to be discriminated against and denied equal access to, and an equal opportunity to benefit from and participate in, Harvard's programs and services. Consequently, Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 29 U.S.C. §§ 794a(a)(2), 794a(b).

102.    WHEREFORE, Plaintiff requests relief as set forth below.

## THIRD CAUSE OF ACTION

### Violation of the Massachusetts Equal Rights Act, M.G.L. c. 93 § 103, *et seq*.

103.    Plaintiff realleges and incorporates herein all previously alleged paragraphs of this Complaint.

104.    The Massachusetts Equal Rights Act ("MERA") provides that "Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodations, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property,

sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution." Massachusetts General Law chapter 93 § 103.

105.    Article CXIV of the Massachusetts Constitution holds that "No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." Mass. Cons. Art. CXIV.

106.    As individuals with mental health disabilities, impacted members of Plaintiff S4MHJ qualify as "handicapped persons" under M.G.L. c. 151B because each has, has a record of having, or has been regarded as having "a physical or mental impairment which substantially limits one or more major life activities" such as caring for one's self, learning, and working. *See* M.G.L. c. 151B §§ 1(17), (20).

107.    Harvard is an education establishment within the jurisdiction of the state of Massachusetts, and as such is obligated to comply with the provisions of Mass. Cons. Art. CXIV and M.G.L. c. 93 § 103.

108.    Harvard has violated and continues to violate the MERA and Massachusetts Constitution by excluding students with mental health disabilities from fully and equally enjoying Harvard's programs and activities.

109.    As a proximate result of Harvard's violations of the MERA and Massachusetts Constitution, members of Plaintiff S4MHJ who are Harvard students have been injured as set forth herein.

110.    Plaintiff has no adequate remedy at law and unless the relief requested herein is

granted, Plaintiff will suffer irreparable harm in that its Harvard student members will continue to be discriminated against and denied access to Harvard's programs and activities. Consequently, Plaintiff is entitled to injunctive and appropriate equitable relief, as well as reasonable attorneys' fees and costs. M.G.L. c. 93 §§ 103(b, d).

111.    WHEREFORE, Plaintiff requests relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of the Fair Housing Act,
### 42 U.S.C. § 3601, *et seq.*

112.    Plaintiff realleges and incorporates herein all previously alleged paragraphs of this Complaint.

113.    The Fair Housing Act prohibits discrimination in the terms, conditions, sale, or rental of a dwelling, on the basis of disability. 42 U.S.C. § 3604(f)(1)–(2); *see also* 24 C.F.R. §§ 100.20, 100.60(a), 100.60(b)(2).

114.    As persons with mental health disabilities, impacted members of S4MHJ are protected from discrimination under the Fair Housing Act. 42 U.S.C. § 3602(h); *see also* 24 C.F.R. § 100.201.

115.    Harvard's residence halls are covered "dwellings" under the Fair Housing Act. *See* 42 U.S.C. § 3602(b), (c); *see also* 24 C.F.R. § 100.201.

116.    The Fair Housing Act prohibits discrimination in the form of refusing to make reasonable accommodations in rules, policies, practices, or services, when such may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

117.    The Fair Housing Act also prohibits making, publishing or printing any notice or statement with respect to the sale or rental of a housing accommodation that indicates a

preference, limitation or discrimination on the basis of disability. 42 U.S.C. § 3604(c).

118.    Housing and Urban Development ("HUD") regulations implementing the Fair Housing Act clarify that prohibited actions include using different criteria, standards, requirements, rental procedures, or lease or contract provisions, because of disability. 24 C.F.R. §§ 100.60(b)(4), 100.65(b)(1).

119.    Prohibited actions further include limiting the use of a dwelling's privileges, services, or facilities, or evicting tenants because of disability. 24 C.F.R. §§ 100.60(b)(5), 100.65(b)(4).

120.    Harvard has violated the Fair Housing Act by maintaining and implementing terms and conditions of housing that exclude and otherwise discriminate against S4MHJ members who are Harvard students on the basis of disability, namely, by excluding students from mental health disabilities from, and preventing them from regaining access to, their student housing after being hospitalized for mental health related reasons or receiving inpatient mental health treatment.

121.    Harvard has further violated the Fair Housing Act by refusing to make reasonable accommodations in rules, policies and services, when such accommodations may be necessary to afford S4MHJ members who are Harvard students equal opportunities to use and enjoy their student housing.

122.    Harvard has violated HUD regulations implementing the Fair Housing Act by utilizing criteria, standards, and requirements that discriminate against S4MHJ Harvard student members on the basis of disability, including by requiring them to submit personal statements and medical documentation in advance of being readmitted to student housing when returning from a mental health related leave of absence, hospitalization, or inpatient treatment.

123.    As a proximate result of Harvard's violations of the Fair Housing Act, Plaintiff's Harvard student members have been injured as set forth herein.

124.    Because Harvard's discriminatory conduct presents a real and immediate threat of current and continuing violations, declaratory and injunctive relief are appropriate remedies pursuant to the Fair Housing Act.

125.    Plaintiff has no adequate remedy at law and unless the relief requested herein is granted, Plaintiff's Harvard student members will suffer irreparable harm in that they will continue to be discriminated against and denied access to Harvard's programs and services. Consequently, Plaintiff is entitled to injunctive relief, as well as reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c).

126.    WHEREFORE, Plaintiff requests relief as set forth below.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of its Harvard student members, requests:

a.    An order finding and declaring that Defendants' acts, omissions, policies, and practices as challenged herein are unlawful;

b.    That Defendants be enjoined from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Massachusetts Equal Rights Act, and the Fair Housing Act;

c.    That Defendants be ordered to eliminate their discriminatory policies and practices with respect to the exclusion of students with mental health disabilities from campus, and adopt policies and procedures sufficient to remedy the violations complained of herein, including but not limited to:

a.  Eliminating campus ban policies and allowing students who have been cleared for discharge from the hospital, emergency room, or inpatient treatment to return to enrollment and residence on campus, if applicable, immediately;

b.  Eliminating the use of treatment contracts as a condition of return to enrollment and residence on campus;

c.  Reforming leave of absence policies for students going on leave (whether voluntary or involuntary) for mental health reasons by:

   i.  Implementing individualized assessments for students seeking to return from mental health leaves of absence with deference to the student's chosen treating medical providers, in consultation with Harvard's Disability Access Office;

   ii.  Eliminating work or volunteer requirements during leaves of absence, unless they are clinically indicated by the student's chosen treating medical providers, in consultation with Harvard's Disability Access Office; and

   iii.  Implementing other accommodations and modifications to leave policies as necessary to accommodate the needs of the individual on leave.

d.   Implementing reasonable accommodations or modifications wherever possible to allow students with mental health disabilities to benefit from and participate in Harvard's programs, activities, and services to the same extent as students without mental health disabilities;

e.  Eliminating the requirement that students surrender their medical privacy rights and allow Harvard to directly contact their treating medical providers;

f.  Reforming all confidentiality and privacy policies relating to students with mental health disabilities and disclosure of mental health related issues to eliminate deterrence from accessing Harvard programs, activities, and services.

g.  An award of reasonable attorneys' fees and costs; and

h.  Such other relief that the Court deems just and proper.


Dated: November 14, 2025                 DISABILITY RIGHTS ADVOCATES

By:      /s/Thomas Zito
         Thomas Zito (BBO# 679136)
         2001 Center St., Third Fl.
         Berkeley, CA 94704
         Tel: (510) 665-8644
         Fax: (510) 665-8511
         tzito@dralegal.org

         Madeleine Reichman*
         655 Third Avenue, Suite 2619
         New York, NY 10017
         Tel.: (212) 644-8644
         Fax: (212) 644-8636
         mreichman@dralegal.org

By:      /s/ Anna P. Prakash
         Anna P. Prakash*
         Kiese Hansen*
         NICHOLS KASTER, PLLP
         4700 IDS Center, 80 S. 8th Street
         Minneapolis, MN, 55402
         Telephone: (612) 256-3200
         Facsimile: (612) 338-4878
         aprakash@nka.com
         khansen@nka.com

         *Counsel for Plaintiff*
         *Admitted Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Thomas Zito*
Thomas Zito